**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 784 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | July 29, 2019 in the Court of |
| | : | Common Pleas, Franklin County, |
| v. | : | Criminal Division at No. CP-28-CR- |
| | : | 0000382-1997. |
| | : | |
| ALBERT E. REID, | : | SUBMITTED: December 11, 2020 |
| | : | |
| Appellant | : | |

## OPINION

**CHIEF JUSTICE BAER**                    **FILED: September 22, 2021**

This is a direct appeal from an order dismissing a petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Appellant Albert E. Reid ("Appellant"), who is sentenced to death, presents the Court with a multitude of issues.[1] We affirm the order in all respects, save one. Respectfully, the PCRA court did not provide its rationale for rejecting the fact-intensive issue relating to Appellant's competency to proceed to trial and represent himself and prior counsels' alleged ineffectiveness for failing to pursue the issue. Consequently, we remand the matter to the PCRA court solely to issue a supplemental opinion addressing its reasons for denying relief on these claims.

---

[1] A final order under the PCRA, in a case in which the death penalty has been imposed, is directly appealable to this Court. 42 Pa.C.S. § 9546(d).

## I. Background

### A. Factual summary[2]

Carla Reid was Appellant's estranged wife, and D.M. was Carla's fourteen-year-old daughter from a previous relationship. During their time together, Appellant regularly abused Carla. This abuse resulted in Carla filing several Protection from Abuse ("PFA") petitions, which ultimately led to the entry of a final PFA order on October 30, 1996. That order directed that Appellant could not have any contact with Carla or her children.

Meanwhile, in July of 1996, Carla and D.M. informed State Police that they wanted to press charges against Appellant for sexually assaulting D.M.. Based upon these allegations, the Commonwealth charged Appellant with, *inter alia*, aggravated indecent assault. Trial on those charges was scheduled to begin on January 6, 1997. Between July of 1996 and December 27, 1996, Appellant made several threats that he was going to kill Carla and D.M.. In addition, he purchased a gun, and despite the terms of the PFA order and the conditions of his bail on the sexual assault charges, Appellant continued to have unwanted contact with Carla and to threaten her.

After leaving work at approximately 11:20 p.m. on December 26, 1996, Carla stopped at a local Chambersburg bar called Kel's Place. Upon entering Kel's Place, Carla was distraught, reporting to her friend, Ruby Murray, that Appellant had followed her to the bar and threatened to shoot her in the head. Several other witnesses observed Appellant sitting in his truck outside of Kel's Place. Carla subsequently left Kel's Place and picked up her six children at the babysitter's house at approximately 12:30 a.m. on

---

[2] We glean our summary of the facts from this Court's opinion affirming Appellant's judgment of sentence, *Commonwealth v. Reid*, 811 A.2d 530 (Pa. 2002), which contains a more thorough recitation of the background underlying this matter. When necessary to resolve Appellant's various issues, we will provide further, relevant factual details of the case.

December 27th. Carla nervously drove herself and the children home, where they all went to sleep.

At some time in the early morning hours of December 27th, Appellant entered Carla's home and then shot Carla and D.M. in the head, killing both of them. The Commonwealth charged Appellant with one count of burglary and two counts of first-degree murder. A jury found Appellant guilty of those charges. After a penalty hearing, the jury sentenced Appellant to death on both of his murder convictions.

More specifically, as to the murder of Carla, the jury found three aggravating circumstances: (1) Appellant killed Carla to prevent her from testifying as a prosecution witness in a criminal proceeding in which Appellant was charged with committing the felony offense of aggravated indecent assault, 42 Pa.C.S. § 9711(d)(5); (2) Appellant killed Carla in the course of a felony burglary, *id.* at § 9711(d)(6); and (3) Appellant was convicted of the first-degree murder of D.M., which he committed at the time that he murdered Carla, *id.* at § 9711(d)(10). The jury found one mitigating circumstance relative to Carla's murder: Appellant had no significant history of prior criminal convictions, *id.* at § 9711(e)(1).

Regarding the murder of D.M., the jury also found three aggravating circumstances: (1) Appellant killed D.M. to prevent her from testifying as a prosecution witness in the criminal proceeding in which Appellant was charged with the felony offense of aggravated indecent assault, *id.* at § 9711(d)(5); (2) Appellant killed D.M. in the course of a felony burglary, *id.* at § 9711(d)(6); and (3) Appellant was convicted of the first-degree murder of Carla, which he committed at the time he murdered D.M., *id.* at § 9711(d)(10). As was the case with Carla's murder, the jury found the mitigating circumstance that Appellant had no significant history of prior criminal convictions, *id.* at § 9711(e)(1).

Concerning both murder convictions, the jury concluded that the three aggravating circumstances outweighed the mitigating circumstance. Thus, as noted above, the jury returned two death sentences. On October 21, 1998, the trial court imposed those sentences. Appellant filed post-sentence motions, which the trial court denied. Appellant appealed his judgment of sentence.

**B. Direct Appeal**

On September 20, 2002, this Court affirmed Appellant's judgment of sentence. *Commonwealth v. Reid*, 811 A.2d 530 (Pa. 2002). Among other things, we concluded that: (1) the Commonwealth presented sufficient evidence at trial to convict Appellant of two counts of first-degree murder, *id.* at 536-44; and (2) the sentences of death were not the product of passion, prejudice, or any other arbitrary factor, *id.* at 555. Appellant sought reconsideration of our decision to affirm his judgment of sentence, which this Court denied on December 30, 2002. Appellant then filed a petition for writ of *certiorari* in the United States Supreme Court, and the High Court denied that petition on October 6, 2003. *Reid v. Pennsylvania*, 540 U.S. 850 (2003).

**C. PCRA Petition**

The procedural history of Appellant's PCRA petition is prolonged and convoluted. Appellant filed his initial petition on September 22, 2004. In February of 2007, Appellant filed a supplemental PCRA petition, and three years later, he filed a second supplemental PCRA petition. On November 17, 2010, the Commonwealth filed an answer to the petition and its supplements. Therein, the Commonwealth, *inter alia*, objected to the format of Appellant's second supplement to his PCRA petition, which caused: (1) Appellant to resubmit that document in the appropriate form; and (2) the Commonwealth to file an

additional response. In his various filings, Appellant presented 19 primary claims and "many more sub-claims."[3] PCRA Court Opinion, 1/13/2014, at 12.

After the original trial judge recused from the matter, the petition was assigned to Judge Richard Walsh for disposition. The Commonwealth then filed a document entitled "Motion for Judgment as a Matter of Law," which the PCRA court granted in part and denied in part the motion. This action lead to the dismissal of a handful of Appellant's claims. Thereafter, Judge Walsh retired from the bench, and the matter was reassigned to Judge David Grine.

As best we can discern, the parties agreed to hold an initial evidentiary hearing solely for the purpose of allowing Appellant to present the testimony of his pretrial, trial, and appellate counsel, as many of his claims for relief asserted counsel's ineffective stewardship. That hearing occurred in March of 2013, and the PCRA court later permitted Appellant to supplement the record with witness depositions.

On July 17, 2014, the PCRA court entered an order dismissing another handful of Appellant's claims based upon the evidence presented in the initial evidentiary hearing. The court subsequently authored an 81-page opinion in support of that order. PCRA Court Opinion, 1/13/2014. At the conclusion of that opinion, the court explained, "The next stage in this case is to address un-dismissed claims. That will be done after the Parties are finished gathering evidence to support and rebut those remaining claims." *Id.* at 81.

---

[3] The PCRA court candidly admitted that, given the haphazard manner in which Appellant presented his various claims, it had "a hard time keeping track of all of the claims." PCRA Court Opinion, 1/13/2014, at 13. Indeed, according to the court, Appellant's PCRA petition and supplements "include over 75 separate substantive requests for relief." *Id.* The court understandably criticized Appellant's shotgun approach but nonetheless attempted to address each of his claims. As discussed in more detail below, Appellant unfortunately has employed a similar litigation tactic in this appeal.

For unexplained reasons, the case remained dormant for approximately four years. The matter came to a conclusion when, on July 29, 2019, the PCRA court issued an opinion and order rejecting the remainder of Appellant's claims for relief. Appellant timely filed a notice of appeal.

## II. General Principles of Law

To be eligible for PCRA relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (delineating the eligibility requirements of the PCRA). A petitioner also must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* at § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* at § 9544(a)(2). For purposes of the PCRA, a claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* at § 9544(b).

Appellant presents a multitude of issues for review, most of which allege ineffective assistance of counsel. It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. *Commonwealth v. Cooper*, 941 A.2d 655, 664 (Pa. 2007). To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." *Id.* A PCRA petitioner must address each of these prongs on appeal. *See Commonwealth v. Natividad*, 938 A.2d 310, 322 (Pa. 2007)

(explaining that "appellants continue to bear the burden of pleading and proving each of the [ineffective assistance of counsel] elements on appeal to this Court"). A petitioner's failure to satisfy any prong of this test is fatal to the claim. *Cooper*, 941 A.2d at 664.

When this Court reviews an order dismissing or denying a PCRA petition, its standard of review is whether the findings of the PCRA court are supported by the record and are free from legal error. *Commonwealth v. Ligons*, 971 A.2d 1125, 1136-37 (Pa. 2009). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court[.]" *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015) (quoting *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013)). "Appellant has the burden to persuade this Court that the PCRA court erred and that such error requires relief." *Commonwealth v. Wholaver*, 177 A.3d 136, 144-45 (Pa. 2018). Lastly, it is well settled that this Court may affirm a valid judgment or order for any reason appearing as of record. *Commonwealth v. Flanagan*, 854 A.2d 489, 503 (Pa. 2004).

## III. Discussion

### A. Introduction

Like the PCRA court, we express our frustration with the manner in which Appellant has litigated this matter, both in the PCRA court and on appeal. *Supra*, at 5 n.3. Appellant enumerates ten issues for this Court's consideration, but many of those issues contain multiple sub-issues. For example, Appellant's first issue can be accurately described as a patchwork of a half-dozen-or-so claims of ineffective assistance of counsel, most of which are underdeveloped. In addition, the documents which contain Appellant's myriad PCRA claims span over 200 pages collectively. Yet, in presenting his issues and sub-issues on appeal, Appellant's brief often fails to indicate where he raised and preserved the issues in the PCRA court, in violation of Pa.R.A.P. 2119(e). *Wholaver*, 177 A.3d at 145. Moreover, despite the voluminous nature of the certified record, Appellant also

consistently fails to provide citation to the record to identify where various facts allegedly were established, in violation of Pa.R.A.P. 2119(c).

Further complicating matters, Appellant has failed to address properly an important threshold issue in this matter. At the time of Appellant's direct appeal from his judgment of sentence, this Court's precedent required a defendant to raise claims of ineffective assistance of counsel at the time that the defendant received new counsel. *Commonwealth v. Grant*, 813 A.2d 726, 732 (Pa. 2002). If a defendant failed to follow this directive, he waived any claim of ineffective assistance of previous counsel.[4] *Id.* The defendant, however, could, in a sense, nonetheless pursue his claim of ineffective assistance of previous counsel if, in a future proceeding, he presented a "layered" claim of ineffective assistance of counsel; that is to say, the defendant would have to claim that his most recently withdrawn counsel was ineffective for failing to raise the ineffective assistance of defendant's previous counsel. *See id.* at 733 (explaining that "the only way to consider claims related to trial counsel's ineffectiveness that were not raised on direct appeal by new counsel was to plead and prove the additional claim of appellate counsel's ineffectiveness, *i.e.*, a layered claim of ineffectiveness"). Here, the PCRA court determined that Appellant was required to layer his claims of ineffective assistance of trial counsel. PCRA Court Opinion, 1/13/2014, at 18-20.

In his brief to this Court, Appellant does not include in his "Statement of Questions Involved" any issue regarding the PCRA court's conclusion that he was required to layer his claims of ineffective assistance of trial counsel, nor does Appellant include discussion of any such issue in the "Argument" portion of his brief. Instead, toward the beginning of his brief, Appellant includes a "Statement Regarding Layering of Claims." Appellant's

---

[4] For all intents and purposes, this Court, in *Grant*, replaced this procedure, directing that claims of ineffective assistance of counsel should be brought in PCRA proceedings regardless of whether defendants procure new, post-conviction counsel.

Brief at 1-3. In that statement, which is not authorized by the Rules of Appellate Procedure, Appellant contends that we should reject the PCRA court's determination that he is required to layer his claims of ineffective assistance of trial counsel. However, he notes that, "in an abundance of caution," he layered his claims of ineffective assistance of trial counsel. *Id.* at 3.

As noted, the Rules of Appellate Procedure do not sanction a "Statement Regarding Layering of Claims." Indeed, the Rules make abundantly clear that appellate courts will not consider the merits of an issue unless it is stated in the "Statement of Questions Involved" or "is fairly suggested thereby." Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); *see also* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type distinctively displayed -- the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Because Appellant's "Statement of Questions Involved" does not contain any issue challenging the PCRA court's determination regarding "layering," we will not entertain his current complaints. Pa.R.A.P. 2116(a). In other words, for purposes of this appeal, Appellant is and was required to layer his claims of ineffective assistance of trial counsel.[5]

**B. Issues**

---

[5] We observe that, when an appellant fails to establish a meritorious claim of ineffective assistance of trial counsel, that failure is fatal to his related claim that appellate counsel rendered ineffective assistance by failing to argue trial counsel's allegedly deficient stewardship. *See Commonwealth v. Tedford*, 960 A.2d 1, 13 (Pa. 2008) (explaining that an appellant's inability to prove each prong of the ineffective-assistance-of-counsel standard as to trial counsel's purported ineffective stewardship is fatal to a layered claim of ineffectiveness). Consequently, we will address Appellant's claims of ineffective assistance of appellate counsel only if he establishes a claim that trial counsel was ineffective.

**1. "Did trial counsel render ineffective assistance of counsel at the guilt-innocence phase of trial by failing to: effectively litigate discovery issues; effectively impeach the Commonwealth's witnesses; present expert testimony on gunshot residue and cultural practices; and effectively litigate issues relating to other crimes evidence; were trial counsel ineffective for presenting testimony that undermined the defense's trial argument; was appellate counsel ineffective for failing to litigate these issues on direct appeal?"** Appellant's Brief at 3.

As shown above, Appellant's first issue addresses multiple claims of ineffective assistance of counsel, all of which the PCRA court rejected. Appellant's Brief at 15-52. Generally speaking, Appellant contends that his trial counsel failed to prepare adequately for trial by, *inter alia*, failing to obtain sufficient discovery material from the Commonwealth. *Id.* at 15-18. He then narrows that contention by making more specific allegations of ineffective assistance of counsel, which we now will address.

## a. Inadequate cross-examination of Commonwealth witnesses

At trial, the Commonwealth elicited testimony from several witnesses to show that, prior to the murders of Carla and D.M., Appellant attempted to, and eventually did, buy a gun. Those witnesses included Mary Jones, Cassandra Utley, Bonita Short, and Anthony Hurd. In his PCRA petition, Appellant posited that trial counsel rendered ineffective assistance by failing to impeach those witnesses sufficiently on cross-examination.

### i. Mary Jones

During Appellant's trial, Mary Jones testified that, in December of 1996, Appellant worked on her vehicle, and during that process, he asked her for help in procuring a gun; she then sold him a firearm and bullets. *Reid*, 811 A.2d at 540. In his PCRA petition, Appellant argued both that trial counsel failed to use effectively the discovery materials the Commonwealth provided them to impeach Jones' credibility and that counsel not did seek discovery of additional impeachment material. *Compare* PCRA Petition, 9/22/2004, at ¶ 76 (stating, in regard to Jones' testimony, that "counsel did not effectively use the materials they had to cross-examine her"), *with id.* at ¶ 84 ("If counsel had sought

discovery after [Jones'] testimony, he would have learned exactly how many times that she met with the prosecution.").

Throughout his PCRA petition, Appellant acknowledged that his trial counsel impeached Jones' credibility to some extent; however, the thrust of his claim was that counsel failed to impeach Jones to the degree that he now believes was warranted. Appellant suggested that counsel's cross-examination of Jones was constitutionally inadequate because counsel did not question her about: (1) false claims that she made to an investigating trooper that she had cancer that was brought on by Voodoo; and (2) three inconsistent statements about who traded the gun to her that she then sold to Appellant. PCRA Petition, 9/22/2004, at ¶¶ 76-89; Appellant's Brief at 19-21.

In its January 13, 2014, opinion, the PCRA court explained its various reasons for finding that Appellant's claims lack merit. PCRA Court Opinion, 1/13/2014, at 28-30. In so doing, the court observed that Appellant "glosse[d] over the questions actually asked of Jones while she was on the stand." *Id.* at 28. The court highlighted that, during her testimony, "Jones admitted that she used crack, sold crack, bought a gun with crack, illegally sold a gun, and lied to police." *Id.* The court further noted that Jones' "odd beliefs" about Voodoo were revealed through her testimony. *Id.* at 28-29. In other words, the court concluded that counsel effectively attempted to impeach Jones' credibility.

In addition, the PCRA court found that Appellant's various sub-claims lacked merit. For example, in his petition, Appellant insisted that trial counsel could have questioned Jones about the psychiatric treatment that she had received concerning her claims of cancer caused by Voodoo. The court disagreed, explaining, "Whether Jones held delusional beliefs or incorrectly believed that she had cancer was a collateral matter." *Id.* at 29. The court further opined that this line of questioning would have been irrelevant, as any belief Jones had regarding a cancer diagnosis would not have reflected her

character or propensity for truthfulness. Lastly, the court asserted that Jones' psychiatric records would not have been admissible to impeach her. *Id.* at 29 (citing Pa.R.E. 608(b)(1) (setting forth the general rule that the character of a witness concerning truthfulness may not be attacked by cross-examination concerning specific instances of the witness' conduct)).

On appeal, Appellant offers a cursory attack on the PCRA court's rationale for rejecting his claims regarding Jones. Appellant's Brief at 44. As to the court's observation that counsel, in fact, impeached Jones, Appellant states that simply because Jones "was impeached on *some* issues does not preclude a finding of ineffectiveness for failing to impeach her on others." *Id.* (emphasis in original). Regarding the court's assessment of counsels' decision not to question Jones about her psychiatric history, Appellant simply asserts, "Ms. Jones's psychiatric history was not a collateral matter, but admissible to determine reliability." *Id.* (citing *Commonwealth v. Davis*, 674 A.2d 214, 215 (Pa. 1996)). In response, the Commonwealth takes the position that the PCRA court correctly concluded that trial counsel effectively cross-examined Jones. Commonwealth's Brief at 9-10.

We reiterate that, on direct-examination, Jones testified, *inter alia*, that: (1) she procured the gun that she sold to Appellant by trading $30 worth of crack cocaine for it, N.T., 10/7/1998, at 351; (2) she lied, or "didn't tell the whole truth," to police when they initially questioned her about this case, *id.* at 360; and (3) she used crack cocaine, *id.*

On cross-examination, trial counsel questioned Jones about her lies to police regarding where she obtained the gun in question, including at least two names that Jones gave to officers as to the original owner of the gun. *Id.* at 363-66, 373. Counsel further asked Jones about: (1) the illegal crack-for-gun exchange and other drug dealing, *id.* at 366-68, 381; (2) her drug use, *id.* at 368-69; (3) the fact that she falsely implicated persons

regarding from whom she illegally purchased the gun, *id.* at 369; and (4) the reality that she never faced charges for admitting to these infractions, *id.* at 369-70. In addition, cross-examination revealed that Jones admitted to knowing the name of the person that sold her the gun (Robert), in contrast to her testimony on direct-examination that she did not know this person's name. *Compare id.* at 357-58 (stating, on direct examination, that she does not know the person who sold her the gun) *with id.* at 779-80 (explaining that the man who sold her the gun was named Robert). Counsel also questioned Jones about her belief that she had cancer and whether she thought that the cancer was caused by Voodoo.[6] *Id.* at 385-86.

As the above discussion demonstrates, the record supports the PCRA court's conclusion that trial counsel adequately cross-examined Jones in an attempt to undermine her credibility. Appellant's underdeveloped claim to the contrary fails to establish the requisite arguable merit component of the ineffective-assistance-of-counsel standard. Further, given counsel's thorough cross-examination of Jones, we are unconvinced that Appellant was prejudiced by counsels' alleged failure to cross-examine her in the manner that he now believes was necessary, *i.e.*, Appellant has failed to persuade the Court that, but for counsels' omission, there is a reasonable probability that the outcome of his trial would have been different. *Cooper, supra*

### ii. Cassandra Utley

Cassandra Utley is Mary Jones' friend. At trial, she testified that she heard Appellant speak to Jones about purchasing a gun. *Reid*, 811 A.2d at 540 n.13 (citing N.T., 10/7/1998, at 410). In his brief to this Court, Appellant initially complains that

---

[6] The Commonwealth objected to counsel's question regarding Voodoo on the ground that it was an irrelevant collateral matter. *Id.* at 386-88. The record does not reflect whether the court ultimately sustained or overruled the objection; however, Jones never answered the question.

counsel was ineffective for failing to cross-examine Utley with materials that: (1) revealed that she was in police custody for a probation violation when she testified at Appellant's trial; and (2) demonstrated that her version of events was contradicted by one of Jones' statements to police. Appellant's Brief at 21-22. Appellant then makes an abrupt about-face, stating that "trial counsel had no obligation to seek the above information about Utley's custody/violation status and the Commonwealth's failure to provide this information violated *Brady*.[7]" *Id.* at 22. This equivocal advocacy borders on frivolous and merits no further discussion other than to observe the claim's obvious lack of arguable merit.

### iii. Bonita Short

Bonita Short is Mary Jones' cousin. At trial, Short testified that, in December of 1996, Appellant came to her home to purchase a gun from Jones. *Reid*, 811 A.2d at 540 n.13 (citing N.T., 10/7/1998, 396-99). In his PCRA petition, Appellant claimed that trial counsel was ineffective for failing to interview Short prior to trial. PCRA Petition, 9/22/2004, at ¶ 91. Appellant suggested that, had counsel interviewed Short, they would have learned, *inter alia*, that: (1) police told her that they would arrest her if she refused to cooperate; (2) Jones had asked Short to lie about the gun that Jones had sold to Appellant; (3) police were trying to charge Jones with conspiracy in connection with Appellant's case; and (4) Jones often was in trouble with police but nonetheless was able to stay out of jail. *Id.* at ¶¶ 92-93. The thrust of Appellant's claim was that counsel could have used this information to undermine the credibility of Jones and Short. Appellant supported this claim by providing an unsworn declaration allegedly signed by Short. Exhibits to PCRA Petition, 1/27/2005, at Ex. 6.

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

At a March 21, 2013, evidentiary hearing, both of Appellant's trial counsel were asked whether they interviewed Short. Attorney Kulla stated that the team made pretrial attempts to interview Short. N.T., 3/21/2013, at 68. Specifically, counsel went to Short's last known address in Carlisle to try to interview her; however, counsel was unable to locate Short. *Id.* at 68-69. Counsel further testified that the defense team subsequently directed Appellant's investigator to locate Short, but the investigator was unsuccessful as well. *Id.* at 69. When Appellant's other counsel, Attorney Trambley, was asked if he remembered whether the defense team attempted to interview Short, he testified, "No, I don't recall whether we did or not." *Id.* at 159.

The PCRA court concluded that Appellant's ineffective-assistance-of-counsel claim failed on both the arguable merit and reasonable basis prongs. PCRA Court Opinion, 1/13/2014, at 30. In so doing, the court credited Attorney Kulla's testimony that the defense team, in fact, made at least two attempts to interview Short prior to Appellant's trial. *Id.* In the course of making this decision, the court stated, "The [c]ourt finds that Mr. Kulla's testimony is more reliable than Short's unsworn declaration." *Id.* (footnote omitted).

In his brief to this Court, Appellant offers another cursory response to the PCRA court's rationale for rejecting his claim. Appellant's Brief at 45. Appellant focuses solely on the PCRA court's passing statement that Attorney Kulla's testimony was more reliable than Short's unsworn declaration. Appellant contends that the court was in no position to make that credibility determination, as it refused to hear testimony from Short; thus, an evidentiary hearing was necessary to resolve a material fact in dispute. Notably, Appellant does not identify with specificity the disputed fact. The Commonwealth essentially claims that the PCRA court correctly rejected Appellant's claim on the basis of Attorney Kulla's credible testimony. Commonwealth's Brief at 11.

As an initial matter, the PCRA court could have ended its analysis by rejecting Appellant's claim that trial counsel was ineffective for failing to interview Short based solely on the credited testimony of Attorney Kulla. The court's reference to Short's unsworn declaration was unnecessary. In any event, in her unsworn declaration, Short did state that she was never interviewed by Appellant's defense team. Exhibits to PCRA Petition, 1/27/2005, at Ex. 6. That statement, however, does not conflict in any manner with Attorney Kulla's testimony that the defense team unsuccessfully attempted to interview Short. Indeed, there is nothing in the record that would suggest that Short would have had any idea what efforts the defense team made in preparing for Appellant's trial.

Stated succinctly, the PCRA court's credibility determination regarding Attorney Kulla is supported by the record and, therefore, is binding on this Court. *Mason*, *supra*. That credibility determination undermines Appellant's claim that counsel was ineffective for failing to interview Short prior to his trial and demonstrates the argument's lack of arguable merit.

### iv. Anthony Hurd.

At Appellant's trial, Anthony Hurd testified that Appellant spoke with him on three occasions about whether Hurd could help him find a gun. N.T., 10/8/1998, at 499-503. In his PCRA petition, Appellant asserted, *inter alia*, that Hurd described only two encounters with Appellant in his statement to police. PCRA Petition, 2/22/2004, at ¶¶ 100-05; First Supplement to PCRA Petition, 2/16/2007, at ¶¶ 13-16. Appellant claimed that trial counsel was ineffective for failing to procure this statement and impeach Hurd with it at trial.

The PCRA court rejected this claim, opining that Appellant had not demonstrated how counsel's alleged omission prejudiced him. PCRA Court Opinion, 1/13/2014, at 32.

More specifically, the court stated, "[Appellant] fails to show how questioning Hurd about a minor detail would have affected the outcome of his trial." *Id.*

In his brief to this Court, Appellant makes a minimal effort to refute the PCRA court's reasoning. Appellant's Brief at 46. Appellant merely asserts that Hurd's credibility was "hanging by a thread" and that "[a]ny additional impeachment would have been significant." *Id.* The Commonwealth, like the PCRA court, submits that Appellant has failed to indicate how he was prejudiced by counsel's alleged oversight. Commonwealth's Brief at 11. According to the Commonwealth, "[t]o suggest that if the jury had heard that Appellant only asked Hurd twice to purchase a gun they would have reached a different verdict is illogical." *Id.*

A review of the trial transcript reveals that Hurd's testimony was relatively short. N.T., 10/8/1998, at 498-504. Through it, the Commonwealth sought to establish that Appellant tried to purchase a gun from Hurd, but to no avail. *Id.* at 499-503. On cross-examination, trial counsel was able to get Hurd to admit that, when he first gave his story to police, he was in jail for drug charges, although Hurd denied that he was offered any deals for his cooperation. *Id.* at 504-05. Counsel then pressed Hurd on a few particulars of his memories regarding his interactions with Appellant, after which the prosecutor briefly examined Hurd on redirect. *Id.* at 505-07.

We agree with the PCRA court that Appellant has failed to demonstrate that he was prejudiced by counsel's alleged failure to question Hurd about why he initially told police that he interacted with Appellant twice but then testified at trial that he interacted with him three times. Appellant concedes on appeal that Hurd's credibility was tested at trial, and we fail to see how further impeaching him about such a minor matter results in a reasonable probability that the outcome of his trial would have been different. This claim, thus, fails for lack of prejudice.

**b. Failure to challenge gunshot residue analysis at trial.**

At Appellant's trial, the Commonwealth presented the testimony of Alfred Schwoeble, "a manager at a materials analysis laboratory specializing in electro-microscopy[.]" *Reid*, 811 A.2d at 542. Schwoeble testified that his examination of Appellant's gloves and jacket revealed that the clothing contained particles characteristic of gunshot residue. N.T., 10/8/1998, at 604-11. Schwoeble further stated, *inter alia*, that, given the number of particles he discovered, it was "highly unlikely" that they transferred to Appellant's jacket by way of casual contact. *Id.* at 607.

In response to Schwoeble's testimony, Appellant offered the testimony of Lonnie Hardin, an expert in ballistics and related matters. N.T., 10/9/1998, at 649. Relevant here, Hardin stated that his examination of the jacket "did not find the presence of any gun powder, gun powder residues or the presence of blood but [he] did find slight reaction to lead." *Id.* at 652. Notably, Hardin performed his tests on the jacket after it had been examined by the Commonwealth. The Commonwealth's test utilized "adhesive lifters to remove gunshot residue[.]" *Id.* at 653-54. Given these previous tests, Hardin expressed that he was not surprised that he did not find gunfire-related material on the jacket. *Id.*

In his PCRA petition, Appellant contended that his trial counsel were ineffective for failing to "present evidence to explain alternative origins for the microscopic particles found on the jacket[.]" PCRA Petition, 9/22/2004, at ¶ 131. Appellant asserted that counsel could have presented evidence that Appellant came into contact with the particles in question while performing automotive work. *Id.* at ¶¶ 131-32. In support of his claim, Appellant provided the unsworn declarations of Robert O'Brien and Thomas Kubic, Ph.D., purportedly forensic chemists who are experts in gunshot residue evidence. Exhibits to PCRA Petition, 1/25/2005, at Exhibit 16, and Notice of Filing, 7/17/2013. In his unsworn declaration, O'Brien suggested that: (1) the evidence presented at trial did not prove that

a firearm was discharged near Appellant's jacket; (2) the particles in question can be transferred through casual contact; and (3) per a 2002 scientific journal article, automotive brake lining contains particles similar to those present in gunshot residue. Exhibits to PCRA Petition, 1/25/2005, at Exhibit 16.

The PCRA court rejected Appellant's claim, characterizing it as "frivolous[.]" PCRA Court Opinion, 1/13/2014, at 40. The court first concluded that the claim lacked arguable merit because one of his trial counsel, Attorney Steven Kulla pointed out during his PCRA hearing testimony that O'Brien's opinion was based in part on a 2002 scientific journal article published after Appellant's 1998 trial. *Id.* (citing N.T., 3/21/2013, at 94). In addition, the court asserted that Schwoeble's trial testimony contradicts O'Brien's proposed testimony that the particles in question can be transferred by casual contact. The court further opined that O'Brien's declaration is of little use, "as O'Brien stated that a conviction should not be based on gunshot-residue evidence alone[,]" which clearly was not the state of the evidence presented at Appellant's trial. *Id.* Without elaboration and for reasons that are unclear, the court further noted that Appellant could not satisfy the requisites for demonstrating that trial counsel was ineffective for failing to call a specific expert witness at trial, like O'Brien. *Id.* at 40 n.18.

Next, the PCRA court determined that Appellant failed to prove that trial counsels' actions were unreasonable. Citing again to Attorney Kulla's PCRA hearing testimony, the court highlighted that Appellant never informed his counsel that he performed automotive work; thus, they did not investigate the possibility that the particles originated therefrom. *Id.* at 40-41. Moreover, the court stated, trial counsel called an expert to testify at trial, Lonnie Hardin, who opined that the presence of the particles was insignificant. *Id.* at 41. According to the court, counsel's decision to utilize Hardin as a "rebuttal expert was not unreasonable." *Id.*

In his brief to this Court, Appellant takes the position that the PCRA court's reasoning is flawed in a number of ways. Appellant's Brief at 46-48. Appellant first posits that simply retaining an expert like Hardin does not render counsel constitutionally effective; rather, counsel "must retain an expert with the expertise necessary to address the relevant issues in the case and effectively consult with that expert." *Id.* at 47 (citation omitted). Appellant contends that, here, his counsel hired the wrong expert because Hardin was not a forensic chemist and, thus, could not rebut Schwoeble's trial testimony regarding the particles that he found on Appellant's jacket.

Secondly, Appellant alleges that the PCRA court missed the point of O'Brien's declaration wherein he stated that the particles on Appellant's jacket can be transferred by casual contact. Appellant suggests that one of the purposes of O'Brien's statement was to demonstrate that Schwoeble's trial testimony to the contrary was inaccurate. Next, Appellant submits that the court erred by discounting O'Brien's declaration on the ground that the court did not hear live testimony from him and, therefore, could not properly assess his credibility. *Id.* at 47-48.

Fourth, Appellant asserts that it is of no significance that he did not inform counsel about his automotive work as counsel already was aware of this fact through discovery and evidence presented by the Commonwealth regarding Mary Jones, who testified that Appellant worked on her vehicle. Indeed, Appellant contends that his failure to volunteer this information does not excuse the fact that counsel did not act on the information that they possessed. *Id.* at 48. Fifth, Appellant submits that, contrary to the PCRA court's conclusion, he has met the requirements for proving that counsel was ineffective for failing to call a specific expert witness by submitting the declarations of expert witnesses Kubic and O'Brien. *Id.*

Lastly, Appellant challenges, as unsupported by the record, the PCRA court's finding that O'Brien's opinion was based in part on an article published after Appellant's trial, suggesting instead that the opinion could have been presented at the time of trial. *Id.* For its part, the Commonwealth offers a brief argument in support of its position that this sub-issue warrants no relief. Commonwealth's Brief at 12-13.

Initially, we find that, because Appellant's PCRA petition did not include a claim that trial counsel were ineffective for failing to call Kubic, O'Brien, or any other particular expert witness at trial, this claim is waived.[8] Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Appellant, however, did contend in his petition that trial counsel were ineffective for failing to present evidence to explain alternative origins for the particles found on his jacket, namely, automotive work. PCRA Petition, 9/22/2004, at ¶¶ 131-32.

The underlying merit of this claim rests entirely on the fact-based premise that Appellant wore the jacket in question while preforming automotive work. Yet, Appellant's brief fails to indicate that he ever averred, let alone offered to prove, that he, in fact, wore the jacket while performing an automotive repair prior to the Commonwealth testing the jacket. Further, while it is true that the record reveals that counsel knew that Appellant worked on Mary Jones' vehicle prior to the testing of the jacket, Appellant again fails to specify that he ever averred, let alone offered to prove, that he communicated to counsel that he wore the jacket while completing work on that vehicle. Appellant's failures in this

---

[8] Assuming *arguendo* that Appellant did present this claim somewhere in his PCRA petition or its supplements, he fails to indicate where it was preserved for appeal, in violation of, among other rules, Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.").

regard are fatal to his claim. Accordingly, we conclude that the PCRA court did not err by finding that the claim lacks arguable merit.

### c. Presentation of trial evidence that was inconsistent with the defense theory of the case.

In his PCRA petition, Appellant reported that Dr. Isidore Mikalakis performed autopsies on the victims, noting in his autopsy reports that each victim suffered a single, close-range gunshot wound to her head. PCRA Petition, 9/22/2004, at ¶ 122. Appellant further averred that pretrial proceedings revealed that the Commonwealth believed that the gunshots occurred within one to two feet of the victims' heads. *Id.* at ¶ 123. Appellant asserted that part of his trial defense was that he could not have been the shooter due to the close-range nature of the gunshots and the fact that police did not discover any blood spatter on his clothing. *Id.* at ¶ 121.

Dr. Mikalakis testified at trial, and Appellant highlighted in his petition that trial counsel did not question Dr. Mikalakis about the distance from which the victims were shot.[9] Instead, counsel later called Dr. Louis Roh, a forensic pathologist, as an expert defense witness. *Id.* at ¶ 124. Appellant suggested that counsel knew prior to Dr. Roh's testimony, per his pretrial report, that, contrary to Appellant's trial strategy, Dr. Roh would testify that the gunshots were inflicted from a distance, not at close range. *Id.*

Appellant stated that his counsel nevertheless presented testimony from Dr. Roh during his trial. *Id.* at ¶ 125. Appellant noted that Dr. Roh initially testified that the gunshots occurred from a minimum distance of two feet from the victims' heads but that the doctor opined that the shots could have originated from up to four feet from the victims' heads. *Id.* at ¶¶ 125-26. Appellant claimed that: (1) this testimony did nothing to advance

---

[9] A review of Dr. Mikalakis' trial testimony shows that he never testified that the victims were shot at close range. He merely testified that the victims died from single gunshot wounds to their heads. N.T., 10/5/1998, at 97 and 101.

his defense; and (2) the prosecutor mocked this testimony in his closing remarks. *Id.* at ¶ 127. Appellant then simply asserted that his counsel "blundered badly by putting Dr. Roh on the stand and [Appellant] was prejudiced." *Id.*

At the PCRA hearing, Attorney Kulla testified that Dr. Roh's theory of the case was consistent with the defense's strategy. N.T., 3/21/2013, at 89. Attorney Kulla stated that the Commonwealth suggested that there was blood spatter on Appellant's jacket and that the defense's position was that the spatter was not from these shootings given that Dr. Roh testified that the shootings occurred from a distance. *Id.*

Appellant's second trial counsel, Attorney Robert Trambley, had a different take on Dr. Roh's trial testimony. He conceded that Dr. Roh's report was inconsistent with the defense's theory of the case. *Id.* at 174-75. When asked why the defense nevertheless decided to call Dr. Roh to the witness stand, Attorney Trambley asserted that Attorney Kulla wanted to utilize Dr. Roh's testimony "because how else would [they] justify the money [they] spent to bring him down [to trial from New York]." *Id.* at 175.

In its opinion, the PCRA court stated that, on direct examination, Dr. Roh testified that he would expect blood spatter to be found on a person shooting others from the distances described above. PCRA Court Opinion, 1/13/2014, at 37-38. The court then reported that, during cross-examination, "Dr. Roh, confronted with a treatise on the subject [of blood spatter,] was forced to admit that back spatter does not travel very far, although it could travel up to two feet." *Id.* at 38. The court nevertheless rejected Appellant's claim of ineffective assistance of counsel, concluding that counsel had a reasonable basis for calling Dr. Roh to testify at trial. *Id.*

In support of its conclusion, the PCRA court found that Dr. Roh's testimony contradicted the Commonwealth's account of the shootings. The court opined that, although Dr. Roh's testimony was self-contradictory, it still potentially sowed doubt and

confusion concerning the Commonwealth's case. The court stated, "If, as the Commonwealth proffered, the shooting occurred at one to two feet, then Dr. Roh's testimony highlights the lack of blood spatter. But if the shooting occurred farther away, [Appellant] succeeded in contradicting the Commonwealth's theory of the manner of shooting." *Id.* In closing, the court found that Attorney Trambley was not credible and that counsel were not ineffective "merely because the Commonwealth successfully impeached [Appellant's] witness on cross-examination." *Id.*

In his brief to this Court, Appellant complains that, in rejecting his claim, the PCRA court ignored Attorney Trambley's PCRA hearing testimony, which was based upon the "mistake of fact" that blood was found on Appellant's jacket. Appellant's Brief at 34 and 49. Appellant asserts, "Because the PCRA court based its determination of reasonableness on a hypothetical conception of what counsel could have thought - as opposed to what counsel actually thought - this ruling was based on a *post hoc* rationalization and should be rejected." *Id.* at 49.

The Commonwealth posits that the PCRA court correctly determined that Appellant's counsel had a reasonable basis for calling Dr. Roh as a witness at trial. Commonwealth's Brief at 14. According to the Commonwealth, "Dr. Roh's testimony contradicted the Commonwealth's theory that the shootings occurred at a distance of one to two feet in that he testified that the blood spatter would be expected at that distance." *Id.* The Commonwealth submits that, because police did not find blood on Appellant's body or clothing upon his arrest, "trial counsels' strategy was advanced by Dr. Roh's testimony." *Id.* at 14-15.

Appellant's claim fails. First, in both his PCRA petition and his appellate brief, Appellant insists that his trial strategy was to contend that he could not have killed the victims because they were shot at close range and Appellant had no blood on his clothing.

The crux of his claim is that trial counsel were ineffective for allowing Dr. Roh to testify because his testimony contradicted this strategy. Yet, neither Appellant's PCRA petition nor his brief cite a single instance at trial where his counsel actually presented the jury with evidence or argument in furtherance of this alleged trial strategy, and we may not act as Appellant's advocate and search the extensive certified record to confirm Appellant's allegation. Thus, it is less than clear that Dr. Roh's testimony, in fact, conflicted with anything that the defense team presented to the jury. Consequently, Appellant has failed to persuade either the trial court or this Court that his claim has arguable merit.

Next, we agree with Appellant that the PCRA court did not provide a record-based reason for its conclusion that counsel had a reasonable basis for allowing Dr. Roh to testify; instead, the court improperly gleaned a reasonable basis. In other words, the PCRA court concluded that counsel acted reasonably by eliciting testimony from Dr. Roh because it sowed doubt and confusion in the jurors' minds; however, counsel did not testify at the PCRA hearing in a manner consistent with this conclusion. *Cf. Commonwealth v. Hanible*, 30 A.3d 426, 442 (Pa. 2011) ("As to the reasonable basis prong, we recognize that, generally, the court should not glean from the record whether counsel had a reasonable basis for his action or inaction absent an evidentiary hearing, and that it is only in the most clear-cut cases that the reasons for counsel's conduct are apparent from the record.").

We note, however, that the PCRA court appears to have mislabeled its conclusion. Indeed, while the court's reasoning does not support a determination that counsel had a reasonable basis for utilizing Dr. Roh's testimony, it does provide support for a ruling that Appellant was not prejudiced by counsels' action. In this regard, we observe that, on a cold record, the questions that the defense and Commonwealth asked Dr. Roh, combined with his answers, make for a confusing read. However, close inspection of the totality of

his testimony reveals that he simply opined that: (1) the victims were shot from a minimum of two feet; (2) if they were shot from two feet or closer, then the shooter would have blood spatter on his person and clothing; and (3) if the victims were shot at a range outside of two feet, then it is less likely that the shooter would have blood spatter on his clothes or person. *See generally* N.T., 10/9/1998, at 672-84.

Due to the actual nature of Dr. Roh's testimony, we find that the PCRA court reasonably concluded that it sowed doubt and confusion into the case. We reiterate the following conclusion from the PCRA court: "If, as the Commonwealth proffered, the shooting occurred at one to two feet, then Dr. Roh's testimony highlights the lack of blood spatter. But if the shooting occurred farther away, [Appellant] succeeded in contradicting the Commonwealth's theory of the manner of shooting." PCRA Court Opinion, 1/13/2014, at 38. Regardless of the PCRA court's characterizations, we find that this reasoning demonstrates that Appellant was not prejudiced by counsels' decision to allow Dr. Roh to testify. Stated differently, Appellant has failed to persuade the Court that, but for counsels' decision to call Dr. Roh, there is a reasonable probability that the outcome of his trial would have been different.

**d. Failure to challenge Voodoo evidence.**

At the time of the murders, Appellant was living in a motel room. Upon searching that room, police discovered, *inter alia*, "a folded piece of paper wrapped in cellophane and covered with blue tape in a left shoe." *Reid*, 811 A.2d at 543. The paper had several notations, including the victims' names. "At trial, the Commonwealth presented testimony from Rafael Martinez, a consultant to the Miami Dade County, Florida, Police Department for crimes involving Afro Caribbean religions, who had examined the paper discovered in the shoe." *Id.* Martinez testified that the notations on the paper were associated with the Haitian religion of Voodoo and that they "invoked assistance from a number of Voodoo

deities or gods related to death or darkness." *Id.* Martinez stated that "he believed to a reasonable degree of professional certainty that the person who owned the paper considered the persons named on the paper as enemies and wanted them destroyed or dead." *Id.*

In his defense, "Appellant presented testimony from Monica H. Gordon, a professor of Caribbean studies at the Fashion Institute of Technology and Walden University." *Id.* at n.23. Gordon agreed that the paper had Voodoo symbols but added, *inter alia*, that under Voodoo and Obeah, a religion similar to Voodoo and practiced in Appellant's homeland of Jamaica, "a client seeks help from a Voodoo or Obeah practitioner who may invoke death on others by using magical powers and the client does not himself cause death to others." *Id.*

In his PCRA petition, Appellant contended that, when the Commonwealth pressed Gordon on cross-examination, she stated that she was uncomfortable with providing an expert interpretation of Voodoo symbols. PCRA Petition, 9/22/2004, at ¶ 143 (citing N.T., 10/9/1998, at 699). Given this testimony, Appellant claimed that counsel were ineffective for failing to call an expert in Voodoo, choosing instead to rely upon the testimony of Gordon. *Id.* Appellant maintained that, if counsel had called an expert in Voodoo, the jury would have learned, *inter alia*, that the note was not a death wish but, rather, an attempt to control the people on the list. In support of this claim, Appellant offered the unsworn declaration of Ina J. Fandrich, Ph.D., a university professor whose area of research expertise is in Voodoo. Exhibits to PCRA Petition, 1/27/2005, at Ex. 8.

At the PCRA hearing, when asked whether the defense team procured an expert in Haitian culture or Haitian Voodoo, Attorney Kulla responded that Appellant is not Haitian; rather, he is Jamaican. N.T., 3/21/2013, at 102-03. He stated that the defense obtained an expert in the religion of Appellant's country, Obeah, and that she (Gordon)

testified that the note was positive, not negative. *Id.* When asked whether he had a strategic reason for "failing to get an expert who could interpret the note[,]" Attorney Kulla replied, "I did get an expert who interpreted the note in the proper manner that helped [Appellant], and the voodoo expert would have concurred -- likely concurred with Dr. Martinez's testimony, that the note was negative and harmful to [Appellant]." *Id.*

When Attorney Trambley was questioned at the hearing, he was asked whether he had a specific reason for not seeking an expert who was comfortable with Voodoo interpretation. *Id.* at 182. Attorney Trambley stated, "No, I guess the only reason we did it was because [Appellant] was from Jamaica, and we thought since Obeah was practiced there rather than voodoo, but, no . . . because [Gordon] had admitted that it was voodoo, the document itself, no, we had no reason for not getting a voodoo expert." *Id.* at 183.

The PCRA court rejected Appellant's claim. PCRA Court Opinion, 1/13/2014, at 43-45. The court *sub silencio* credited Attorney Kulla's testimony, concluding that counsel had a reasonable basis for calling Dr. Gordon as a witness instead of an expert in Haitian culture. The court cited the fact that Appellant is Jamaican, not Haitian. *Id.* at 45. The court further observed that some of the things that Appellant's "hypothetical expert in Haitian voodoo would have testified to mirror Dr. Gordon's actual testimony." *Id.* By way of example, the court noted that, in his unsworn declaration, Dr. Fandrich suggested that he would have testified that "the note is not a death wish but an attempt to control the people on the list, and spirits - not adherents - cause the requested deed to be done." *Id.* "Dr. Gordon testified that someone who consults an Obeah practitioner does not actively participate in harming the 'cursed' individual and that the work was done through 'magic.'" *Id.*

In his brief to this Court, Appellant argues that the PCRA court erred by concluding that counsel had a reasonable basis for not calling an expert in Haitian Voodoo to testify

at his trial. Appellant reminds the Court that Attorney Trambley testified that the defense team had no strategic basis for failing to utilize such an expert. Appellant's Brief at 49. Regarding Attorney Kulla's testimony, Appellant states, "Mr. Kulla testified that they sought an expert in Obeah because it was a Jamaican religion and their client was Jamaican; the note was not a Voodoo note; and he did not recall that Dr. Gordon was unable to interpret the symbols on the note." *Id.* at 35. Appellant then simply asserts that Attorney "Kulla's explanation was based on a mistake of fact[.]" *Id.* at 35 and 49.

Appellant makes no effort to substantiate his allegation that Attorney Kulla's credited testimony was based upon a mistake of fact. It certainly is not a mistake of fact that Appellant is Jamaican or that Obeah is a religion practiced in Jamaica. Nor is it a mistake of fact that Attorney Kulla could not recall that Gordon testified that she was not comfortable offering expert testimony on Voodoo symbols. It is arguably a mischaracterization of Gordon's testimony to suggest that she stated that the note in question was not a Voodoo note; however, that arguable "mistake" does not negate the entirety of Attorney Kulla's testimony as to why the defense team utilized Gordon as an expert at trial.

Indeed, a review of the totality of Attorney Kulla's PCRA hearing testimony supports the PCRA court's conclusion that counsel had a reasonable basis to use Gordon as an expert witness. As noted above, Attorney Kulla testified that he believed that it was strategically useful to Appellant to offer the testimony of an expert with experience with the Voodoo-like, Jamaican-based religion of Obeah, given that Appellant is Jamaican. Further, the PCRA court's opinion aptly explains its reasons for concluding that Appellant's hypothetical expert in Haitian Voodoo would have testified in a manner similar to Dr. Gordon's actual trial testimony. PCRA Court Opinion, 1/13/2014, at 45. In short, the opinions of Gordon and Fandrich overlapped insomuch as they agreed that the note

in question does not suggest that Appellant wanted to participate actively in the deaths of the victims. For these reasons, Appellant has failed to persuade us that the PCRA court erred by finding that counsel had a reasonable strategic basis for calling Gordon to testify at trial.

**e. Failure to litigate effectively other bad acts evidence.**

Prior to Appellant's trial, the trial court entered an order allowing the Commonwealth to present evidence concerning Appellant's prior abuse of his wife, Carla. Trial Court Order, 10/2/1998, at ¶ 1. The court held that this evidence was "relevant to show ill will and/or malice[.]" *Id.* The court instructed that "the Commonwealth will be permitted to introduce such evidence after an offer of proof to [the trial] court showing that such incidents are not too remote in time from the murders." *Id.* The court further instructed, "If the evidence will constitute hearsay, such evidence may be introduced only after the Commonwealth has shown the existence of an applicable exception to the hearsay rule." *Id.* At trial, the Commonwealth presented several witnesses who testified about incidents of Appellant's abuse of Carla.

In his PCRA petition, Appellant averred that trial "counsel never sought, and the prosecution never gave, <u>any</u> offers of proof at trial and simply introduced a parade of irrelevant and highly prejudicial testimony about alleged prior bad acts of [Appellant]." PCRA Petition, 9/22/2004, at ¶ 113 (emphasis in original). Appellant then provided examples of when he believed counsel should have objected to witnesses' testimony on the ground that the Commonwealth failed to meet the requirements of the aforementioned pretrial order. *Id.* at ¶¶ 113-20. The crux of Appellant's claim was that trial counsel were ineffective for not objecting to the Commonwealth's failure to abide by the pretrial order requiring an offer of proof.

The PCRA court rejected Appellant's claim on several grounds. PCRA Court Opinion, 1/13/2014, at 33-37. Initially, the court held that the claim lacked arguable merit. *Id.* at 35. Stated succinctly, the court concluded that the complained-of evidence was properly admitted because it demonstrated Appellant's motive, ill will, and malice. *Id.* The court also determined that Appellant's claim failed the reasonable-basis prong of the ineffective-assistance-of-counsel standard. *Id.* at 36. In this regard, the court noted that trial counsel had a standing objection to the "hearsay statements of prior bad acts." *Id.* The court further observed that, at the PCRA hearing, Attorney Kulla testified that he did not need to request offers of proof because he had reviewed each witnesses' pretrial statements and was aware of how the witnesses would testify. *Id.* at 36-37 (citing, *inter alia*, N.T., 3/31/2013, at 86-87). In addition, the court highlighted that trial counsel adequately cross-examined these witnesses. *Id.* at 37.

In his brief to this Court, Appellant concedes that trial counsel objected to the admissibility of the prior abuse evidence before and during his trial. *See, e.g.*, Appellant's Brief at 36 ("Over defense objections as set forth in pretrial motions, the trial court permitted the Commonwealth to present evidence of prior alleged abusive acts between Appellant and his wife, Carla Reid, for the purpose of establishing malice."); *id.* at 37 ("Trial counsel lodged a standing objection and reasserted their hearsay objections[.]"). Appellant, however, insists that counsel nonetheless offered constitutionally deficient representation by failing "to request offers of proof and fail[ing] to make a contemporaneous and particularized objection to the ways in which the proffered testimony exceeded the trial court's 10/2/98 order." *Id.* For its part, the Commonwealth argues that the PCRA court employed legally sound reasoning in rejecting Appellant's claim. Commonwealth's Brief at 16-17.

This issue warrants no relief because Appellant's claim lacks arguable merit. As Appellant concedes, trial counsel objected to the admissibility of the complained-of evidence. Most importantly, during the second day of trial, Attorney Trambley asked the trial court for a sidebar, where counsel acknowledged that the court had ruled on Appellant's objection to testimony regarding prior incidents of abuse. N.T., 10/6/1998, at 269. Counsel nonetheless stated for the record Appellant's standing objection to the admissibility of that evidence. *Id.* The court responded, "The [c]ourt will give you an objection to all of the witnesses who testify as to the prior incidents. You don't need to stand up every time and object to every witness. We note your objection on the record. We'll take it as to all the witnesses as to the prior relationship." *Id.*

The trial court was well aware of Appellant's disagreement with the court's decision to allow anyone to testify about any alleged prior incidents of Appellant abusing Carla. Indeed, the court specifically acknowledged Appellant's standing objection to all such evidence and went so far as to instruct trial counsel not to "object to every witness." *Id.* There simply is no arguable merit to Appellant's current claim that counsel should have done more to express their concern that evidence of prior incidents of abuse were inadmissible and highly prejudicial to Appellant.

**f. Cumulative prejudice.**

In his brief to this Court, Appellant asserts that he "was prejudiced by his trial counsel's failure to effectively challenge nearly every aspect of the prosecutor's case. Even if each individual instance of ineffectiveness did not establish prejudice, the combined effect did." Appellant's Brief at 39 (citation omitted). This Court has explained that no number of claims which fail on their merits may collectively warrant relief. *Commonwealth v. Spotz*, 18 A.3d 244, 320–21 (Pa. 2011). However, "[w]hen the failure

of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Id.* at 321.

None of the claims of ineffective assistance of counsel discussed above warrant relief. We have disposed of these issues in a number of ways. "To the extent that we reject some of Appellant's issues based upon a prejudice analysis, we also find that collective prejudice is lacking and, thus, deny relief on this issue." *Wholaver*, 177 A.3d at 180.

**2. "Did the Commonwealth violate *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence favorable to the Appellant; was appellate counsel ineffective for failing to raise this issue?"** Appellant's Brief at 3.

Within this issue, Appellant argues that the PCRA court erred by rejecting his claims that the Commonwealth violated *Brady*. "The crux of the *Brady* rule is that due process is offended when the prosecution withholds material evidence favorable to the accused." *Wholaver*, 177 A.3d at 158. "The *Brady* rule extends to impeachment evidence including any potential understanding between the prosecution and a witness, because such information is relevant to the witness' credibility." *Id.* To establish such a claim, an appellant must prove that the Commonwealth willfully or inadvertently suppressed impeachment evidence and that prejudice ensued. *Id.*

"Regarding the prejudice prong of this standard, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citation omitted). "In determining if a reasonable probability of a different outcome has been demonstrated, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a

fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 158-59 (citations and internal quotation marks omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Id.* at 159 (citations omitted).

### a. Impeachment evidence.

As noted above, Cassandra Utley testified at Appellant's trial that she overheard Appellant ask Mary Jones if he could purchase a gun from her. In his PCRA petition, Appellant averred, *inter alia*, that Utley was incarcerated in the Dauphin County Prison on a probation violation when she testified at his trial. PCRA Petition, 9/22/2004, at ¶ 174. Appellant contended that this information was valuable impeachment evidence and asserted that, if he would have been aware of it, "he could have questioned [Utley's] incentive for cooperating with the prosecution more effectively." *Id.* Thus, Appellant claimed that the Commonwealth's failure to disclose Utley's custody status constituted a violation of *Brady*.

Anthony Hurd's trial testimony also is pertinent to this issue. At Appellant's trial, Hurd testified that Appellant discussed purchasing a gun from him on three occasions. In his initial PCRA petition, Appellant stated that the "Commonwealth failed to disclose Anthony Hurd's long history of arrests and convictions for drug offenses and immigration law violations." *Id.* at ¶ 177. However, in the first supplement to his PCRA petition, Appellant vaguely speculated that "[u]pon information and belief, the Commonwealth did not permit trial counsel to review the transcript of the 8/19/97 police interview with Anthony Hurd." First Supplement to PCRA Petition, 2/16/2007, at ¶ 38. Appellant then asserted, "The Commonwealth accordingly denied the defense important impeachment material

that would have severely undercut Mr. Hurd's credibility when he testified at trial that [Appellant] asked him about getting a gun." *Id.*

The PCRA court denied Appellant relief. PCRA Court Opinion, 7/29/2019, at 2-3. The court first concluded that the "criminal records referenced were immediately available to [Appellant]." *Id.* at 2. Secondly, the court opined that, "because [Appellant] concedes that such evidence was ultimately given to the jury, any additional evidence regarding such matters would simply be cumulative."[10] *Id.* Lastly, the court suggested that, to the extent that Appellant was claiming that the prosecution offered deals to the above-mentioned witnesses, the record is devoid of any evidence of such deals. *Id.* at 3.

In his brief to this Court, Appellant does not address the PCRA court's conclusion that the record is devoid of evidence of deals nor does he directly confront the court's assertion that he allegedly conceded that the jury received evidence of the witnesses' criminal histories. Appellant's Brief at 56-57. As to the remainder of the court's reasoning, Appellant states that it "is the prosecution's duty to disclose such evidence regardless of whether it is otherwise available." *Id.* at 56 (citation omitted). Then, quoting *Dennis v. Secretary*, 834 F.3d 263, 292 (3d. Cir. 2016) (*en banc*), Appellant asserts, "Only when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense. Any other rule presents too slippery a slope." *Id.* In closing, Appellant contends that simply because trial counsel was able to impeach these witnesses to some degree does not absolve the Commonwealth from failing to disclose additional impeachment evidence. *Id.* at 57.

In response, the Commonwealth argues that the PCRA court correctly rejected these *Brady* claims. Commonwealth's Brief at 17-19. The Commonwealth submits that

---

[10] The court did not provide a citation as to where Appellant offered this alleged concession.

Appellant failed to proffer any evidence during the PCRA litigation that would suggest that the Commonwealth offered Utley leniency in her criminal proceedings in exchange for testifying against Appellant. *Id.* at 18. Next, the Commonwealth highlights that, during a PCRA evidentiary hearing, Attorney Kulla testified that the Commonwealth allowed him to review its entire file on Appellant, which would necessarily include Hurd's statement to police. Indeed, the Commonwealth maintains that Appellant did not point to any evidence demonstrating that the Commonwealth failed to turn over the police report to Appellant's counsel. *Id.* at 19.

These claims are difficult to resolve because, *inter alia*, neither the parties nor the PCRA court provide citations to the certified record to allow this Court to confirm their various record-based assertions. We nonetheless begin our analysis by addressing Appellant's *Brady* claim as it relates to Utley. The certified record reveals that Utley admitted on both direct and cross-examination that she was then currently on probation. N.T., 10/7/1998, at 406; *id.* at 416. Further, Utley testified that she was not offered any promises concerning her probationary status in exchange for her trial testimony. *Id.* at 406. Appellant has not cited any evidence that he proffered in support of his PCRA petition or any evidence of record that would substantiate his speculation that the Commonwealth incentivized Utley to testify at Appellant's trial.

Turning now to Appellant's *Brady* claim as it relates to Hurd, we reiterate that, in his brief to this Court, Appellant complains that the Commonwealth failed to disclose Hurd's pretrial statement to police wherein he stated that Appellant approached him twice about purchasing a gun, in contrast to his trial testimony that Appellant discussed this purchase with him three times. Appellant's Brief at 53. The PCRA court did not address any such claim; rather, it focused on Appellant's primary contention that the Commonwealth withheld Hurd's criminal past and his insinuation that the Commonwealth

may have offered Hurd a deal in exchange for his testimony. PCRA Court Opinion, 7/29/2019, at 2-3.

The PCRA court likely did not address this claim because Appellant did not raise it, in its current form, in his PCRA petition or its supplements.[11, 12] Rather, as noted above, in the first supplement to his PCRA petition, Appellant vaguely speculated that "[u]pon information and belief, the Commonwealth did not permit trial counsel to review the transcript of the 8/19/97 police interview with Anthony Hurd." First Supplement to PCRA Petition, 2/16/2007, at ¶ 38. This speculative assertion was buried in a paragraph that contained conjecture regarding other persons, and the paragraph was presented in the middle of several other paragraphs containing any number of potential claims. Under these circumstances, we find that Appellant waived his current contention regarding Hurd. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

However, out of an abundance of caution, we briefly note that, if the Commonwealth failed to disclose to Appellant Hurd's pretrial statement to police, this failure did not prejudice Appellant. The relatively inconsequential fact that Hurd told police pretrial that he discussed guns twice with Appellant, despite being slightly different from Hurd's trial testimony, does not undermine the confidence in Appellant's murder convictions or otherwise suggest that he did not receive a fair trial.

---

[11] It is worth highlighting that, in his brief to this Court, Appellant does not complain that the PCRA court failed to address the current iteration of his claim concerning Hurd.

[12] Assuming *arguendo* that Appellant did present this claim somewhere in his PCRA petition or its supplements, he again fails to indicate where it was preserved for appeal, in violation of, among other rules, Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.").

**b. Appellant's lack of a criminal record in Jamaica.**

In the first supplement to his PCRA petition, Appellant asserted that: (1) the Commonwealth solicited information from a Jamaican official regarding Appellant's criminal history in that country; (2) the official later faxed a document to the Commonwealth stating that Appellant had no criminal history in Jamaica; and (3) the prosecution withheld that information from Appellant's counsel. First Supplement to PCRA Petition, 2/16/2007, at ¶¶ 33-35. Appellant implied that this failure violated *Brady*.[13]

The PCRA court did not address this claim. In his brief to this Court, Appellant merely notes this omission and then asserts, "Even if this Court does not grant relief as to the guilt-innocence phase, it should grant relief as to the penalty phase." Appellant's Brief at 57. Despite a plethora of precedent regarding *Brady* and its progeny, Appellant chose to present this Court with an undeveloped claim, unsupported by citation to pertinent authority, in violation of Pa.R.A.P. 2119(a). *See Wholaver*, 177 A.3d at 160 ("The Rules of Appellate Procedure require appellants to support their arguments with pertinent discussion and citation to authority.") (citing Pa.R.A.P. 2119(a)). Thus, Appellant has thoroughly failed to convince this Court that his lack of a criminal history in Jamaica, *i.e.*, information of which Appellant, himself, obviously was aware, constitutes *Brady* material.

### 3. "Was the defendant incompetent to proceed to trial and represent himself; were prior counsel ineffective for failing to investigate and effectively litigate this issue before trial and failing to raise it on appeal?" Appellant's Brief at 3.

---

[13] Regarding his death sentence, Appellant observed that: (1) the parties stipulated that he had no history of prior criminal convictions in the United States; and (2) the jury found that he had no significant history of prior criminal convictions. *Id.* at ¶¶ 34-36. Appellant, however, suggested that, because the jury never was told that he had no criminal history in Jamaica, "the mitigating factor did not receive the weight it should have [as] the jury did not know the full extent and quality of the mitigating factor." *Id.* at ¶ 36.

Prior to trial, trial counsel litigated Appellant's competency, and the trial court determined that Appellant was competent to stand trial. Of further relevance to this issue, Appellant represented himself for a relatively brief pretrial timeframe. In his PCRA petition and its supplements, Appellant launched a multifaceted, complex, and somewhat confusing, challenge to his competency to stand trial and represent himself. *See, e.g.*, PCRA Petition, 9/22/2004, at ¶¶ 286-309; First Supplement to PCRA Petition, 2/16/2007, at ¶¶ 74-82; Second Supplement to PCRA Petition, 12/20/2010, at ¶¶ 50-71. Appellant renews that challenge in his appellate brief. Appellant's Brief at 57-83. Stated succinctly, Appellant claims that: (1) he was incompetent to stand trial and represent himself, and the trial court erred by holding otherwise,[14] *id.* at 57-66; (2) trial counsel rendered ineffective assistance in various ways regarding the manner in which they litigated Appellant's competency prior to his trial, *id.* at 66-81; and (3) appellate counsel was ineffective for failing to challenge the trial court's ruling on his competency and for failing to raise trial counsel's ineffectiveness in litigating that issue, *id.* at 81-82.

However, Appellant asserts in his appellate brief that the PCRA court never provided its reasons for rejecting these various claims and sub-claims. *Id.* at 82. Unfortunately, upon review of the PCRA court's orders and opinions, we were unable to locate any discussion of why the court denied relief on these claims. Given the fact-intensive nature of most of these claims, this Court will not address them in the first instance. Accordingly, we are constrained to remand this limited matter to allow the PCRA court to author a supplemental opinion to provide its reasons for rejecting these

---

[14] Citing to *Commonwealth v. Blakeney*, 108 A.3d 739 (Pa. 2014), Appellant argues that he is entitled to relief on his substantive claim because "the failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA." *Blakeney*, 108 A.3d at 751 (quoting *Commonwealth v. Brown*, 872 A.2d 1139, 1153 (Pa. 2005) (plurality)); Appellant's Brief at 65-66.

claims. Given the nature of Appellant's litigation "strategy," we emphasize that the PCRA court should address on remand only why it denied relief on Appellant's claims of incompetency to stand trial and represent himself.

**4. "Did the prosecutor commit misconduct during closing arguments; were prior counsel ineffective for failing to litigate this issue?"** Appellant's Brief at 3.

This issue involves various claims that trial counsel were ineffective for failing to object to alleged prosecutorial misconduct. As discussed *infra*, Appellant contends that the prosecutor committed misconduct during his closing argument to the jury in the guilt phase of trial when he purportedly: (1) commented on Appellant's pre-arrest silence; and (2) expressed his personal views regarding the credibility of Commonwealth witnesses. Appellant's Brief at 83-92.

"It is well established that a prosecutor is free to argue that the evidence leads to guilt and is permitted to suggest all favorable and reasonable inferences that arise from the evidence." *Commonwealth v. Rios*, 684 A.2d 1025, 1032-33 (Pa. 1996). "A prosecutor also may argue his case with logical force and vigor." *Id.* at 1033. "Additionally, a trial court's decision not to grant a new trial based on prosecutorial misconduct will not be reversed on appeal absent an abuse of discretion." *Id.*

**a. Prosecutor's comments on Appellant's pre-arrest silence.**

Corporal Wayne Sheppard of the Pennsylvania State Police was the lead investigator of the murders of the victims. N.T., 10/5/1998, at 52. When Corporal Sheppard encountered Appellant on the morning of the murders, he informed Appellant that his wife and her daughter had been killed. *Id.* at 62. On cross-examination, trial counsel asked the corporal about Appellant's reaction to this news, and he stated that Appellant "became upset" and kept repeating "the words Jesus Christ over and over." *Id.* at 69-70.

On redirect-examination, the following exchange occurred:

[**Prosecutor:**]  Just one other thing.  They had asked you what [Appellant] said to you that morning when you told him about these incidents.  Did you ask him to make arrangements to take care of his children?

[**Corporal:**]  Yes, I did.

[**Prosecutor:**]  What did he say?

[**Corporal:**]  No.

[**Prosecutor:**]  That's all.

[**Court:**]  Let me ask you, Corporal Sheppard, when you told him that his wife, his estranged wife, and his stepdaughter had been killed, did he ask you any questions about how they had been killed?

[**Corporal:**]  No, he did not.

N.T., 10/5/1998, at 77.

During his closing argument to the jury, the prosecutor referenced this exchange, stating as follows:

[The trial court] asked the question that I forgot to ask.  When Corporal Sheppard said, [Appellant], I'm here to notify you that your wife and stepdaughter have been killed, [Appellant] didn't even ask how it had happened or what had happened.  Why?  Because he knew.

That fact escaped me and [the trial court] was astute enough to ask that question, and it was the unasked question by [Appellant] that tells you something about what he knew when the police were there.

And, of course, he's going to act upset.  Anybody that plans these murders is cold-blooded enough to kill his stepdaughter and his wife when they lay sleeping in the house with five other kids, you know, to go to all of that trouble and you ditch the gun, you're going to put on an act when the police tell you about it.

On, no.  But he forgot to say what happened to my wife?  What happened to my stepdaughter?

N.T., 10/9/1998, at 787.

In his PCRA petition, Appellant claimed that the prosecutor violated his federal Fifth Amendment right against self-incrimination.  PCRA Petition, 9/22/2004, at ¶ 211.

Appellant characterized the prosecutor's comments during closing arguments as "impermissible references to [the] exercise of his constitutional right not to testify[.]" *Id.* Appellant complained that the prosecutor commented on his pre-arrest silence, depriving him of a fair trial, and that counsel was ineffective for failing to object to those comments. *Id.* at ¶¶ 211, 217.

The PCRA court disagreed with Appellant. PCRA Court Opinion, 1/13/2014, at 55-58. In support of its decision, the court found that Appellant's claim of ineffective assistance of counsel lacked arguable merit. *Id.* at 57. Citing to Superior Court precedent, the court opined, "Under the law at the time of Reid's trial, a prosecutor could reference a defendant's pre-arrest silence."[15] *Id.* (citing *Commonwealth v. McConnell*, 591 A.2d 288, 290 (Pa. Super. 1991), and *Commonwealth v. Gumby*, 580 A.2d 1110, 1114 (Pa. Super. 1990)).

In his brief to this Court, Appellant asserts that the prosecutor's comments during closing arguments invited the jury to draw adverse inferences from his constitutionally protected decision not to speak to the police. Appellant's Brief at 84. Concerning the PCRA court's opinion, Appellant criticizes the court's reliance on the Superior Court's decisions in *McConnell* and *Gumby*. Appellant asserts that, although "this Court did not specifically address this issue until [*Commonwealth v. Molina*, 104 A.3d 430 (Pa. 2014) (Opinion Announcing the Judgment of the Court ("OAJC")),] the analysis employed therein demonstrates that the PCRA court erred." *Id.* at 91. In this regard, Appellant highlights a passage from the OAJC in *Molina* stating that this Court's "precedent, and the policies underlying it, support the conclusion that the right against self-incrimination prohibits use of a defendant's pre-arrest silence as substantive evidence of guilt unless it

---

[15] The PCRA court also determined that trial counsel had a reasonable basis for not objecting to the prosecutor's closing arguments. Given the manner in which we dispose of this sub-issue, we need not discuss that determination.

falls within an exception such as impeachment of a testifying defendant or fair response to an argument of the defense." *Id.* (quoting *Molina*, 104 A.3d at 451).

In response, the Commonwealth first states that the prosecutor "noted" Appellant's silence to show that he knew how the victims had died, "not as a tacit admission of guilt." Commonwealth's Brief at 28. Next, the Commonwealth submits that, in addressing the merits of Appellant's claim, the PCRA court utilized the correct law, *i.e.*, *McConnell* and *Gumby* - the law that was applicable at the time of Appellant's trial. *Id.* at 28-29. The Commonwealth insists that trial counsel cannot be ineffective for failing to predict any changes in the law, such as *Molina*. *Id.* at 29.

For all intents and purposes, Appellant argues that *Molina* entitles him to relief. Appellant's argument is misplaced. Indeed, assuming *arguendo* that the prosecutor's comments somehow referenced Appellant's Fifth Amendment right against self-incrimination,[16] *Molina* is of no assistance to Appellant. First, the lead opinion in *Molina* is of questionable precedential value given that it is an OAJC. Second, and most importantly, the lead opinion in *Molina* held "that the prosecutor's use of the properly admitted evidence of Defendant's pre-arrest silence to infer guilt violates Article I, Section 9 of the Pennsylvania Constitution." *Molina,* 104 A.3d at 453. In other words, the lead opinion's holding was premised upon the Pennsylvania Constitution, not the United States Constitution. In fact, the lead opinion made clear that its decision was based solely on the Pennsylvania Constitution because the United States Supreme Court had not yet offered a definitive resolution of the pre-arrest-silence issue. *Id.* at 441-42.

In his PCRA petition, Appellant explicitly and exclusively argued that the prosecutor's comments violated his federal constitutional right not to incriminate himself.

---

[16] To be clear, there is no evidence of record that would suggest that Appellant invoked, either explicitly or implicitly, his federal constitutional right not to speak to Corporal Sheppard.

*See*, *e.g.*, PCRA Petition, 9/22/2004, at ¶ 211 ("The Fifth Amendment privilege against self-incrimination bars a prosecutor from commenting to the jury on a defendant's silence. *Griffin v. California*, 380 U.S. 609 (1965).[17] . . . The prosecutor's impermissible references to [Appellant's] exercise of his constitutional right not to testify permeated the closing argument and violated [his] right to a fair trial."). To the extent that Appellant now contends that the prosecutor's comments violated his rights under the Pennsylvania Constitution, he has waived that claim. Pa.R.A.P. 302(a), *supra*. Further, because Appellant relies solely on *Molina* to argue that the PCRA court mistakenly found that the prosecutor did not violate his federal constitutional rights and *Molina* offers no support for that argument, Appellant has failed to demonstrate that the PCRA court erred by concluding that his claim of ineffective assistance of counsel lacked arguable merit.

**b. Prosecutor's comments regarding his personal opinions of the credibility of Commonwealth witnesses.**[18]

During his closing argument at the guilt phase of trial, the prosecutor commented on the testimony of several Commonwealth witnesses, including Vonnie Turnbaugh,[19]

---

[17] In *Griffin*, the High Court addressed the constitutionality of prosecutorial references to defendants' post-arrest silence, not pre-arrest silence, which is at issue here. *See*, *e.g.*, *Commonwealth v. DiNicola*, 866 A.2d 329, 334-35 (Pa. 2005) ("In its seminal decision in [*Griffin*], the Court held that where the defendant does not testify at trial, the Fifth Amendment precludes the government from using a defendant's post-arrest silence as substantive evidence of consciousness of guilt.").

[18] Typical of his myriad wandering claims, Appellant has presented a scattershot of underdeveloped claims of prosecutorial misconduct in this sub-issue. To address this sub-issue in a coherent manner, we will focus on and address only those more developed claims that fit within the general theme of Appellant's sub-issue, *i.e.*, claims that suggest that, during his closing argument, the prosecutor inappropriately bolstered the credibility of some of the Commonwealth's witnesses.

[19] The Commonwealth subpoenaed Turnbaugh, Appellant's friend, to testify at trial. N.T., 10/6/1998, at 196. She testified that, in November of 1996, Appellant: (1) visited her, (2) stated that he did not molest D.M.; (3) insisted that he would kill someone before he went back to prison; and (4) mentioned a gun. *Id.* at 197-99.

Anthony Hurd, and Mary Jones. Regarding Turnbaugh, the prosecutor stated, "His friend. She was not impeached. She is not impeachable. She didn't want to be here but she came here because she was subpoenaed. She was under oath, and she told the truth. She did what she had to do." N.T., 10/9/1998, at 766.

As to Hurd, the prosecutor argued, "He laughed about [being offered a deal to testify]. He said I've been in jail for 21 months, if I made a deal I wouldn't be in jail. The reason Anthony Hurd came here to testify was because he was subpoenaed and he was under oath and he told the truth." *Id.* at 774. Turning his attention to Jones, the prosecutor said as follows:

> Mary Jones knows the story. First thing I asked on direct examination, I wasn't trying to hold anything back. Said, Mary, you didn't tell the whole truth when you first talked to the cops, did you? She said, nope, I didn't.
>
> Then she told the truth and you don't have to guess about whether Mary Jones was telling the truth because there's lots of evidence to support her story. . . .

*Id.*

Concerning these and several other Commonwealth witnesses, the prosecutor explained to the jury:

> [Bonita Short] remembers like Mary [Jones] that [Appellant purchased the gun] for $300. Once again, what is Bonita Short to [Appellant]? What motive does she have to lie? What motive does Mary have to lie? What motive do any of these people have to lie? Friends. There isn't any.
>
> It is the simple conclusion you can draw from that they are not lying, they are telling the truth. Unless you reject their testimony out of hand for absolutely no reason whatsoever, you must conclude that [Appellant] did, in fact, buy this gun five days before these people were killed.

*Id.* at 777.

In his PCRA petition, Appellant complained that the various remarks quoted above demonstrate that, during his closing argument to the jury, the prosecutor committed misconduct by impermissibly and repeatedly using "the weight of his office and his personal opinion to vouch for his witnesses' credibility." PCRA Petition, 9/22/2004, at ¶ 210. Appellant contended that his trial counsel were ineffective for failing to object to these statements. *Id.* at ¶ 217.

The PCRA court rejected Appellant's arguments, finding that they lacked arguable merit. PCRA Court Opinion, 1/13/2014, at 47-51. According to the court, the prosecutor's "argument was a reasonable response to defense counsel's attack on the witnesses' credibility." *Id.* at 49. In support of this position, the court highlighted that Appellant's trial counsel asked Mary Jones whether she had sold drugs, illegally sold a gun, and made false reports to law enforcement. *Id.* The court also noted that trial counsel inquired as to how many times Jones spoke with the prosecutor, "noting that she refused to speak to defense counsel." *Id.* (citing N.T., 10/7/1998, at 389). Further, the court stated, during Appellant's trial counsel's closing argument, he characterized Jones' testimony as a "fable." *Id.* at 49-50 (quoting N.T., 10/9/1998, at 745). Thus, in the court's view, the prosecutor's comments regarding Jones were a fair response to the defense's attack on her credibility. *Id.* at 50.

Turning its attention to the comments about Hurd, the PCRA court observed that, while cross-examining him, trial counsel asked Hurd whether he lied to get out of jail. *Id.* (citing N.T., 10/8/1998, at 504-05). In addition, the court highlighted a portion of trial counsel's closing argument wherein counsel "reemphasized" the point that he intended to make while questioning Hurd about lying to get out of jail. *Id.* (citing N.T., 10/9/1998, at 751-52). Again, the court concluded, "the district attorney's argument was a reasonable response to the attack on Hurd's credibility." *Id.*

As to the prosecutor's comments concerning Turnbaugh, *i.e.*, that she was not impeached, the PCRA court opined that the prosecutor's statement fairly described the evidence of record, as Appellant's trial counsel, knowing that Turnbaugh considered Appellant to be a friend, limited his cross examination of Turnbaugh to whether she clearly understood Appellant given his "thick" Jamaican accent. *Id.* (citing N.T., 10/6/1999, at 196, 199-201). In addition, the PCRA court stated that the prosecutor's general comments about the credibility of witnesses were not improper. The court explained that these comments "mirror comments in other cases in which courts rejected claims of prosecutorial misconduct." *Id.* (citing, as an example, *Commonwealth v. Rios*, 684 A.2d 1025 (Pa. 1996)).

In his brief to this Court, Appellant continues to insist that, during his closing argument, the prosecutor improperly expressed his personal beliefs to the jury about his views on the credibility of the Commonwealth's witnesses. Appellant's Brief at 85-87. Appellant also renews his claim that trial counsel were ineffective for failing to object to this prosecutorial misconduct. *Id.* at 87-89. Regarding the PCRA court's reasoning, Appellant takes the position that the court erroneously concluded that the prosecutor's comments were reasonable responses to trial counsel's attack on the credibility of the Commonwealth's witnesses. *Id.* at 89.

According to Appellant, the governing law in this area "does not permit the prosecutor to make statements of opinion simply because the defense properly questioned witnesses' credibility." *Id.* Citing to *United States v. Young*, 470 U.S. 1 (1985), Appellant submits that "a prosecutor may only make statements of opinion in response to improper, non-evidence-based statements of opinion from the defense." *Id.* Appellant suggests that, here, trial counsel did not express any non-evidence-based statements of opinion about the various witnesses noted above. Rather, counsel leveled legitimate,

record-based attacks on the witnesses' credibility. *Id.* at 90. For its part, the Commonwealth agrees with the PCRA court's conclusion that the complained-of comments were fair responses to trial counsel's attacks on the credibility of witnesses. Commonwealth's Brief at 30-32.

This Court has explained that comments made by a prosecutor to a jury during closing argument "will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Williams*, 896 A.2d 523, 542 (Pa. 2006) (citations and internal quotation marks omitted). "Like the defense, the prosecution is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury." *Id.* "Prosecutorial misconduct will not be found where the comments were based on the evidence or derived from proper inferences." *Id.*

Generally speaking, a prosecutor commits misconduct by improperly bolstering the credibility of a Commonwealth witness when the following two factors are met: "(1) the prosecutor must assure the jury the testimony of the government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record." *Id.* at 541. We further observe that a "prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments." *Commonwealth v. Burno*, 94 A.3d 956, 974 (Pa. 2014). "Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made." *Id.* (citation and internal quotation marks omitted). In addition, we must presume that the jury followed the trial court's instructions. *Commonwealth v. Cash*, 137 A.3d 1262, 1280 (Pa. 2016).

Here, the prosecutor did state that Turnbaugh, Hurd, and Jones "told the truth." Thus, the prosecutor arguably assured the jury that their testimony was credible. Appellant, however, fails to indicate how these alleged assurances reflected the prosecutor's personal knowledge or how his comments could be understood to originate from non-record sources.

Critically, Appellant cannot in good faith suggest that his counsel did not open the door for a response to the suggestion that the Commonwealth's witnesses were incredible. Indeed, during trial counsel's closing argument, he directly and indirectly advocated that several Commonwealth witnesses, including Jones and Hurd, did not tell the truth. *See, e.g.*, N.T., 10/9/1998 at 745 ("Mary Jones' only fable or story didn't say anything about selling a silencer to [Appellant]."); *id.* at 749 ("Let's talk about Mary Jones and Bonita Short. Their lies and their inconsistencies."); *id.* at 752 ("Mr. Hurd really wants you to believe that [Appellant] just walked down the streets of Carlisle and stopped a man because he thought he was Jamaican and asked him to sell him a gun in broad daylight, a man he had only seen once and never even spoke to according to Mr. Reid's testimony.").

Lastly, we observe that, in its charge to the jury, the trial court repeatedly emphasized that: (1) the jury was the sole judge of the witnesses' credibility; (2) the jury's credibility determinations were of vital importance to the outcome of the case; and (3) the jury's recollection of the facts and circumstances of the case controlled these assessments. *See, e.g., id.* at 797 ("Counsel have commented on the facts . . . if your recollection differs from those of counsel, then follow your own recollection."); *id.* at 798 ("Where conflicts cannot be reconciled and again, indeed as to testimony of each and every witness you have heard, it is your duty to decide what the truth really is."); and *id.* at 798-99 ("You must determine that truth or falsity of the various stories that you have

heard. To do this you will have to judge the credibility or believability of the witnesses in this case, and this is a very important matter because the case may turn and be decided upon the credibility or believability of the witnesses you have heard."). As noted above, we must presume that the jury followed these instructions.

For these reasons, we are unconvinced that the complained-of prosecutorial comments rise to the level of prosecutorial misconduct because, *inter alia*, they did not have the unavoidable effect of prejudicing the jurors, "forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." *Williams*, 896 A.2d at 542. Thus, we agree with the PCRA court's conclusion that this claim of ineffective assistance of counsel lacks arguable merit.

**5. "Did the trial court issue defective instructions regarding the burden of proof and reasonable doubt; were prior counsel ineffective for failing to litigate this issue?"** Appellant's Brief at 4.

This issue concerns the trial court's instructions to the jury in the guilt phase of Appellant's trial. Specifically, after explaining to the jury that the Commonwealth carries the burden to prove every element of an offense beyond a reasonable doubt, the court stated, "However, the Commonwealth is not bound to prove the case beyond a reasonable doubt, a shadow of a doubt or to a mathematical certainty." N.T., 10/9/1998, at 801.

Later in its instruction, while explaining how the jury should weigh and assess the testimony of witnesses, the trial court stated as follows.

> The question for the jury is not which side are the witnesses more numerous, but what testimony do you believe, on which side is the preponderance of the evidence after considering the accuracy of the witnesses; their truthfulness or the lack of it; their opportunities for observation; the probability or improbability of their testimony and their interest in the outcome of the case and manner of their appearance on the stand.

Obviously, however, where the testimony of the witnesses appears to you to be of the same quality, the weight of the number does assume significance which you may not ignore.

*Id.* at 810.

Regarding these instructions, Appellant complained in his PCRA petition that the trial court inaccurately informed the jury that: (1) the Commonwealth is not bound to prove Appellant's guilt beyond a reasonable doubt, PCRA Petition, 9/22/2004, at ¶ 223; (2) the Commonwealth need only prove its case by a preponderance of the evidence, *id.*; and (3) if finds all of the witnesses to have the same degree of credibility, it must decide the case based upon the number of witnesses called by the parties, *id.* at ¶ 224. The crux of Appellant's argument was that these instructions impermissibly lessened the Commonwealth's burden of proving Appellant guilty beyond a reasonable doubt. Appellant further contended that trial counsel were ineffective for failing to object to the court's jury instruction. *Id.* at ¶ 229.

The PCRA court rejected Appellant's claim, finding that it lacked arguable merit. PCRA Court Opinion, 1/13/2014, at 59-63. In so doing, the court agreed with Appellant that the following statement was incorrect: "However, the Commonwealth is not bound to prove the case beyond a reasonable doubt, a shadow of a doubt or to a mathematical certainty." N.T., 10/9/1998, at 801; PCRA Court Opinion, 1/13/2014, at 60. The court believed that the sentence was either a misstatement or a typographical error. *Id.* However, the court opined that the charge as a whole clearly instructed the jury that: (1) Appellant was presumed innocent; (2) the Commonwealth bears the burden of proof; and (3) the Commonwealth bears that burden beyond a reasonable doubt. *Id.* The court explained that the misstatement was minor and that its overall charge on reasonable doubt was fair and did not prejudice Appellant. *Id.* at 60-61. In support of this position, the court highlighted that it properly informed the jury ten times of the proper burden of proof. *Id.* at 61.

The PCRA court then, *inter alia*, accused Appellant of "cherry pick[ing] portions of the charge and mischaracterizing them." *Id.* at 63. The court insisted that, when the complained-of portions of the instruction are read in context, they tell "the jury that it should not decide the case based on the number of witnesses called by either side, *unless* it considered all of the witnesses to be equally credible." *Id.* (emphasis in original). For these reasons, the court concluded that Appellant's claim of ineffective assistance of counsel failed.

In his brief to this Court, Appellant argues that the PCRA court's reasoning is erroneous. Appellant's Brief at 95-96. Appellant rejects the court's conclusion that the "'charge as a whole' was correct." *Id.* Appellant supports his position by noting that, in addition to misstating that the Commonwealth need not prove its case beyond a reasonable doubt, the trial court instructed the jury to apply a preponderance of the evidence standard when considering the testimony of conflicting witnesses. *Id.*

Appellant further protests that, contrary to the PCRA court's opinion, the trial court did not instruct the jury that it could consider the number of witnesses presented by the parties; rather, the court required the jury to consider the number of witnesses. *Id.* at 96. According to Appellant, this instruction was erroneous, as "the jury was free to ignore the number of witnesses if it felt that proof beyond a reasonable doubt had not been established." *Id.* Thus, in Appellant's view, his claim of ineffective assistance of counsel requires relief and his conviction cannot stand.

In response, the Commonwealth maintains that, when the jury instructions are read in their entirety, it becomes clear that the jury understood that the Commonwealth must prove its case beyond a reasonable doubt. Commonwealth's Brief at 32-33. Echoing the PCRA court, the Commonwealth highlights that the trial court charged the jury with the correct standard of proof (beyond a reasonable doubt) ten times and that

counsel for the parties emphasized this correct standard throughout their opening and closing arguments to the jury. *Id.* at 33. Unfortunately, the Commonwealth neglected to address the remainder of Appellant's jury-instruction complaints.

The general principles of law that govern jury instructions are well-settled. When an appellate court reviews a jury instruction, it should "consider the entire charge as a whole, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue." *Commonwealth v. Williams,* 732 A.2d 1167, 1187 (Pa. 1999). "An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law." *Commonwealth v. Cook*, 952 A.2d 594, 627 (Pa. 2008) (citation and quotation marks omitted).

It is indisputable that the Commonwealth must prove a defendant's guilt to the standard of beyond a reasonable doubt. *See, e.g., Commonwealth v. Roscioli*, 309 A.2d 396, 398 (Pa. 1973) ("To sustain a conviction, the facts and circumstances which the Commonwealth prove must be such that every essential element of the crime is established beyond a reasonable doubt."). Thus, the trial court in the instant matter incorrectly stated that "the Commonwealth is not bound to prove the case beyond a reasonable doubt[.]" N.T., 10/9/1998, at 801.

That conclusion, however, does not end our inquiry regarding the arguable merit prong of Appellant's claim because, as noted above, we must consider the entirety of the court's instruction to determine whether it fairly conveyed the legal principles at issue. Here, the legal principles at issue were the Commonwealth's burden to prove Appellant guilty beyond a reasonable doubt and the distinct duty of the jury to act as the fact-finder. For the reasons that follow, we conclude that the trial court's instruction fairly conveyed

that the Commonwealth was required to prove Appellant guilty beyond a reasonable doubt.

As an initial matter, the trial court gave a lengthy, accurate, and in-depth explanation of the jury's exclusive duty to measure the credibility of witnesses, to weigh that evidence, and to determine the truth of the case. Regarding the jury's duty, the court explained, in part, as follows:

> You must consider all of the evidence as far as you can recall it and give to each and every part of it such weight as you think it is entitled to. Where there are conflicts in the testimony, and there are conflicts in the testimony here, it is your duty to reconcile them if you can, that is, to put it all together and make one believable story out of it.

> Where conflicts cannot be reconciled and again, indeed as to testimony of each and every witness you have heard, it is your duty to decide what the truth is.

> You must determine the truth or falsity of the various stories that you have heard. To do this you will have to judge the credibility or believability of the witnesses in this case, and this is a very important matter because the case may turn and be decided upon the credibility or believability of the witnesses you have heard.

> Credibility does not mean just the truthfulness or the lack of it, though that is an important matter. It also involves the accuracy of recollection, the accuracy of observation.

> It is possible that a witness intended and desired to tell the truth, yet through faulty memory or faulty observation is mistaken, for seldom do people see something and report the event in exactly the same manner.

> Because of the frailty of man, absolute accuracy in his recollection of past events is not always possible, so you must determine how much of the testimony is both truthful and correct.

> As jurors you may believe all or part or none of the testimony of any of the witnesses and accept only that testimony which you believe. Thus, in passing upon the credibility of the witnesses you have the right to consider their conduct on the witness stand; their manner of testifying; the way their testimony came across to you; their apparent candor or fairness or the lack of it; the probability or improbabilities of their stories; and the problem of fabricating or making up a story and why a particular witness

might want to do that; the extent to which a witness is contradicted or corroborated by other believable testimony in the case; and all the surrounding circumstances.

It is in this way that you can determine which of the witnesses are worthy of credit and belief. And what I just told you is, in summary, you are the finders of fact, who to believe, who to disbelieve, what to believe, what testimony to disbelieve.

N.T., 10/9/1998, at 798-800. We further observe that, just before making the complained-of statement regarding the preponderance of the evidence and how to weigh witnesses' credibility when the testimony of the witnesses appears to be of the same quality, the court correctly explained that "the testimony of one witness may outweigh that of many and carry more weight than the testimony of many other witnesses if you have reason to believe his or her testimony in preference to others." *Id.* at 809.

At this juncture, the trial court provided a thorough and precise explanation of the Commonwealth's duty to prove Appellant guilty beyond a reasonable doubt, save for the last statement in this portion of its instruction. The court explained as follows:

In all criminal cases the law presumes the defendant is innocent until the proof in the case shows the contrary beyond a reasonable doubt. So this defendant as to each and every charge that has been filed against him is presumed to be innocent until the Commonwealth shows his guilt beyond a reasonable doubt.

Therefore, if you are satisfied of the defendant's innocence you must acquit him. If you have a reasonable doubt as to his guilt, he is entitled to be acquitted.

A reasonable doubt is not a doubt that is fancied or conjured up in your mind to escape an unpleasant verdict. It must be an honest doubt arising out of the evidence itself, the kind of doubt that would restrain a reasonable person from acting in a matter of importance to himself.

Thus, if you look at the evidence and scan it from the beginning to the end and keep in mind the credibility of the witnesses and desire to arrive only at the very truth in the case, if under these circumstances your mind cannot rest on the conclusion of guilt, that is a reasonable doubt and the defendant would be entitled to a verdict of not guilty as to each case where you find such a doubt.

If the evidence leaves no such doubt in your mind, then the Commonwealth is justified in asking for a verdict of guilty as charged. The defendant is presumed innocent and has no burden to present any evidence on his behalf.

The burden remains on the Commonwealth throughout the trial of the case and applies to each and every element of the offense to prove the case beyond a reasonable doubt. However, the Commonwealth is not bound to prove the case beyond a reasonable doubt, a shadow of a doubt or to a mathematical certainty.

N.T., 10/9/1998, at 800-01. The remainder of the trial court's instruction included multiple references to the Commonwealth's duty to prove Appellant guilty beyond a reasonable doubt. *See, e.g., id.* at 801 ("In other words, in our system of justice the Commonwealth has to prove his guilt beyond a reasonable doubt."); *id.* at 803 ("You may find the defendant guilty of first degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt."); and *id.* at 812 ("In other words, you may find the defendant guilty based on circumstantial evidence alone, but only if the total amount and quality of that evidence convinces you of the defendant's guilt beyond a reasonable doubt.").

After considering the entirety of the trial court's charge to the jury, we conclude that the instruction fairly conveys the legal principles at issue. More specifically, other than the court's passing and obviously inadvertent, misstatement regarding the Commonwealth's burden of proof, the court clearly, adequately, and accurately instructed the jury regarding the Commonwealth's duty to prove Appellant guilty beyond a reasonable doubt. Further, even if we assume *arguendo* that the court's instruction missed the mark insomuch as it used the phrase "preponderance of the evidence" and when it stated that the jury could not ignore the number of witnesses in the event that conflicting testimony is of equal quality, we nonetheless are convinced that the trial court's

charge to the jury clearly, adequately, and accurately reflected the jury's distinct duties to measure the credibility of witnesses and to weigh the evidence in reaching its verdict.

In sum, we hold that the trial court's instruction did not lessen the Commonwealth's burden of proof below the standard of beyond a reasonable doubt. Thus, we conclude that the PCRA court did not err in finding a lack of arguable merit in Appellant's claim that trial counsel were ineffective for failing to object to the trial court's jury instruction in the guilt phase of trial.[20]

---

[20] This case is distinguishable from our recent decision in *Commonwealth v. Montalvo*, 244 A.3d 359 (Pa. 2021). During the guilt phase of Montalvo's trial, the trial court instructed the jury as follows: "So if the Commonwealth has not sustained it's (sic) burden to that level, the burden of proving the Defendant guilty beyond a reasonable doubt, then your verdict must be guilty." *Montalvo*, 244 A.3d at 369 (citation and emphasis omitted). Later in its charge, the court compounded this misstatement of the law by repeating it. The court stated, "And as I said, if you find that the Defendant was not involved in this, you should find him guilty of all those charges." *Id.* at 371. Counsel immediately corrected the court's mistake on this occasion, only for the court to assert, "Not guilty. Now that was a Freudian slip. Not guilty of all of those charges, if you find that he was not involved in this, first degree murder, as I described it to you." *Id.* at 371-72 (citation and emphasis omitted). The jury ultimately convicted Montalvo of first-degree murder and sentenced him to death.

Montalvo eventually filed a PCRA petition, claiming, *inter alia*, that his trial counsel rendered ineffective assistance by failing to object to the manner in which the trial court instructed the jury on the issue of Montalvo's guilt. The PCRA court agreed with Montalvo and granted him a new trial. The Commonwealth appealed to this Court, and we affirmed the PCRA court's order.

In so doing, the Court found the trial court's initial instruction to the jury to be indisputably incorrect, "as a jury may not find a defendant guilty if the Commonwealth fails to meet its burden of proving the defendant's guilt beyond a reasonable doubt." *Id.* at 369. After addressing and rejecting several of the Commonwealth's arguments that Montalvo was nevertheless not entitled to relief, we focused on the trial court's second erroneous instruction and the court's reaction to being corrected on that instruction. In this regard, we concluded "that the trial court's second erroneous instruction to the jury, and the trial judge's purported correction of the misstatement when brought to its attention by trial counsel, could only have served to prejudice [Montalvo] even further." *Id.* at 372.

Based upon the trial court's two misstatements of the law and its prejudicial comment when correcting the second misstatement, this Court concluded that the record

**6. "Was Appellant's right to a complete polling of the jury violated; were prior counsel ineffective for failing to raise this issue?"** Appellant's Brief at 4.

This issue does not require much discussion, as it is patently frivolous as presented in Appellant's brief to this Court. According to Appellant, after the jury reached its verdict, the trial court *sua sponte* polled the jurors. Appellant's Brief at 97. Appellant asserts that only 11 of the 12 jurors "announced guilty verdicts; Juror No. 2 was never polled and never individually stated his vote."[21] *Id.* Appellant argues that trial counsel was ineffective for failing to object to this alleged oversight. *Id.*

In terms of the prejudice prong of the ineffective-assistance-of-counsel standard, Appellant merely states, "Had counsel objected, the jury would have been fully polled and Appellant's constitutional right [to have the jury polled] would have been realized." *Id.* This statement does not address "prejudice" as it relates to a claim of ineffective assistance of counsel. As we explained above, to establish prejudice, Appellant must demonstrate that but for counsel's omission, there is a reasonable probability that the outcome of the proceeding would have different. *Cooper*, *supra*. Appellant fails to clarify how counsel's lack of an objection to the polling procedure results in a reasonable probability that the outcome of his trial would have been different. Thus, his claim is fatally deficient on its face.

---

supported the PCRA court's conclusion that Montalvo's trial counsel was ineffective for failing to object to the trial court's guilt-phase instruction to the jury.

Contrary to the circumstances that accumulated in *Montalvo*, the trial court in the matter *sub judice* made only one misstatement of the law as it related to the Commonwealth's burden of proof, and the trial judge did not make any statements that exacerbated that singular mistake. Accordingly, our decision in *Montalvo* does not undermine our conclusion in this case that Appellant's claim of ineffective assistance of counsel lacks arguable merit.

[21] The Commonwealth states that Juror No. 2 was the foreperson of the jury and that he announced the jury's verdicts in open court. Commonwealth's Brief at 34.

**7. "Were trial counsel ineffective for failing to investigate and present valuable mitigating evidence at the penalty phase of Appellant's trial; was appellate counsel ineffective for failing to litigate this issue?"** Appellant's Brief at 4.

Herein, Appellant offers a web of confusing claims concerning the mitigation evidence that was presented at or omitted from the penalty phase of his trial. As we discussed above, concerning each murder conviction, the jury found three aggravating circumstances: (1) 42 Pa.C.S. § 9711(d)(5) ("The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses."); (2) 42 Pa.C.S. § 9711(d)(6) ("The defendant committed a killing while in the perpetration of a felony."); and (3) 42 Pa.C.S. § 9711(d)(10) ("The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense."). The jury also found one mitigating circumstance for both of the murder convictions: 42 Pa.C.S. § 9711(e)(1) ("The defendant has no significant history of prior criminal convictions."). To understand fully the confusing nature of Appellant's claims about his counsels' performance relative to mitigation evidence, we begin by reviewing a claim that he made on direct appeal from his judgment of sentence.

In his initial appeal to this Court, Appellant argued that "trial counsel were ineffective for presenting mitigating evidence, specifically evidence that he suffered from a mental illness, because they never properly consulted with him regarding such evidence and he did not want them to present such evidence." *Reid*, 811 A.2d at 553. Addressing this claim, we observed that a criminal defendant has the right to decide whether his counsel will present mitigating evidence and that, where a defendant instructs counsel not to present this evidence, counsel is relieved of his duty to do so. *Id.* (citing

*Commonwealth v. Sam*, 635 A.2d 603 (Pa. 1993)). We, however, further noted that "where a defendant has not directed his counsel to refrain from presenting mitigating evidence, defense counsel has a duty to undertake a reasonable investigation to determine whether mitigation evidence exists." *Id.* (citation omitted). "When a reasonable investigation would have revealed that mitigation evidence on behalf of a defendant existed, defense counsel may be deemed ineffective for failing to present such evidence." *Id.* (citations omitted).

Regarding the relevant circumstances at play in this case, we reported that, prior to trial, "Appellant's counsel attempted to obtain information from Appellant concerning his family, friends, prior schools, and previous jobs in order to prepare for a potential penalty phase of the trial." *Id.* Appellant refused to provide them with information, causing counsel to file a motion with the trial court.

During a hearing on that motion, the "trial court explained to Appellant that his counsel needed information to properly prepare for the penalty phase because the penalty phase was scheduled to start immediately after the jury's verdict should the jury return a verdict of guilty." *Id.* Appellant stated that he did not want to give counsel the requested information unless the jury rendered a guilty verdict. *Id.* at 553-54. The court concluded that Appellant had the right not to provide the requested information to his trial counsel. Despite Appellant's refusal to cooperate with counsel, counsel nonetheless presented mitigation evidence to the jury, including evidence that arguably suggested that Appellant suffered from a mental illness. *See* 42 Pa.C.S. § 9711(e)(2) (stating that mitigating evidence includes circumstance where the "defendant was under the influence of extreme mental or emotional disturbance"). Yet, toward the middle of his penalty hearing, Appellant stated that he did not want his counsel to present any more evidence

of his mental illness, including the testimony of two psychiatrists, Drs. Abram Martin Hostetter and Neil Blumberg. Counsel then ceased their presentation of this evidence.

This Court ultimately rejected Appellant's claim that counsel provided ineffective assistance by presenting mitigating evidence to the jury. In reaching this conclusion, we reasoned that, "because the record shows that Appellant's counsel repeatedly spoke to Appellant regarding the presentation of mitigation evidence, and that Appellant, although uncooperative, never directed counsel not to present mitigation evidence of any kind until he did so in the middle of the actual penalty phase, we do not believe that trial counsel was ineffective for presenting mitigating evidence on Appellant's behalf." *Id.* at 554-55 (footnote omitted). In closing, we opined that "counsel clearly had a reasonable basis for presenting such evidence, specifically, that the jury might find a mitigating circumstance and determine that the mitigating circumstance outweighed any aggravating circumstances [it] also found to exist." *Id.* at 555 (footnote omitted).

In his PCRA petition, despite the claim that he presented in his appeal from his judgment of sentence, Appellant raised a lengthy, multifaceted claim of ineffective assistance of counsel, the thrust of which was that trial counsel were ineffective for failing to investigate, develop, and present mitigating evidence in an adequate manner. PCRA Petition, 2/22/2004, at ¶¶ 310-82. For example, Appellant believed that counsel should have investigated his mental health and troubled upbringing.

The PCRA court rejected Appellant's claim. PCRA Court Opinion, 7/29/2019, at 4-7. As to Appellant's claim that counsel failed to investigate fully his mental health, the court asserted that counsel, in fact, investigated this factor. *Id.* at 6. The court then explained that, "because [Appellant] refused to consent to any further investigation by way of [psychological] testing and refused to provide information for any family members, it cannot now be argued that counsel was ineffective for this reason." *Id.* at 6-7.

In response to this reasoning, Appellant argues to this Court that the PCRA court erred in a number of ways. Appellant's Brief at 123-26. First, Appellant baldly asserts that he was incompetent at the time of trial; thus, "neither the PCRA court nor counsel can rely on his behavior to excuse counsel's deficiencies." *Id.* at 123. Second, Appellant argues, the PCRA court did not meaningfully address counsels' failure to present Drs. Hostetter and Blumberg in support of the mental illness mitigating factor found at 42 Pa.C.S. § 9711(e)(2). *Id.* at 123-24. Next, Appellant contends that, regardless of his unwillingness to cooperate with counsel, counsel nonetheless had a duty to investigate Appellant's mental health issues. *Id.*

Although this discussion only briefly summarizes Appellant's claims regarding mitigation evidence, it is sufficient to demonstrate the inconsistency of his position. On the one hand, Appellant claimed in his previous appeal that counsel was ineffective for presenting mitigation evidence to the jury against his wishes; on the other hand, he now argues that counsel rendered deficient stewardship by failing to investigate and present mitigation evidence to the jury. In making these diametrically opposed contentions, Appellant invites the Court to untie any number of confounding legal knots, despite the clear conflict between his two primary claims. We, however, need not engage in this sophistry to conclude that Appellant cannot obtain collateral relief by raising two incompatible claims of ineffective assistance of counsel. His choice to pursue these conflicting theories for relief is fatal to the instant claim. *Cf. In Interest of J.B.*, 189 A.3d 390, 412 (Pa. 2018) ("When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither.") (quoting *Commonwealth v. Woong Knee New*, 47 A.2d 450, 468 (Pa. 1946)).

**8. "Did the trial court unconstitutionally preclude mitigation at the penalty phase; were prior counsel ineffective for failing to litigate this issue?"** Appellant's Brief at 4.

Under this issue, Appellant shifts the blame to the trial court for what he now perceives as shortcomings with the mitigation evidence presented at his penalty hearing. By way of background, due to Appellant's refusal to cooperate with trial counsel, counsel attempted to call Attorney Trambley, one of his two trial attorneys, to testify at the penalty hearing as to the mitigating factor found at 42 Pa.C.S. § 9711(e)(8), *i.e.*, the catch-all mitigator. Attorney Trambley was prepared to inform the jury that Appellant believed that Attorney Trambley was sent by the devil to work against him and that Appellant refused to cooperate with the presentation of witnesses. N.T., 10/12/1998, at 896.

Appellant, however, communicated that he opposed this strategy and directed counsel not to pursue it. *Id.* at 897. The trial court subsequently held a discussion with counsel and Appellant outside of the jury's presence. After a fairly lengthy conversation, the court did not rule as to whether it would allow Attorney Trambley to testify. *Id.* at 895-903.

Trial counsel later renewed their request to call Attorney Trambley as a mitigation witness. *Id.* at 907. The prosecutor stated that he believed that communications between Appellant and Attorney Trambley were privileged, and the trial court agreed, ruling that it would allow counsel to testify only if Appellant waived the attorney-client privilege. *Id.* at 907-08. The court ultimately refused to allow counsel to testify because Appellant would not waive that privilege. *Id.* at 909.

At that point, the trial court had an off-the-record discussion with counsel, which prompted the court to begin another conversation with Appellant and counsel outside the presence of the jury. *Id.* At the beginning of that discussion, the court reminded Appellant that he refused to waive his attorney-client privilege and that his trial counsel intended to call two psychiatrists, Drs. Blumberg and Hostetter, to testify at the penalty hearing. *Id.*

at 910. The court then asked the prosecutor whether he was able to check "the mental health act." *Id.*

The prosecutor informed the trial court that he was unable to ascertain whether there exists a doctor-patient privilege under these circumstances. The prosecutor suggested that, out of an abundance of caution, pursuant to *Commonwealth v. Sam*, *supra*, Appellant should indicate whether he wanted trial counsel to present mental health mitigation evidence through the testimony of the psychiatrists. *Id.* The court then discussed the issue with Appellant and counsel. During the course of that conversation, the court voiced its concern that there may be a privilege issue with the doctors' testimony but informed Appellant that they could testify if he agreed to it. *Id.* at 913. Despite the court stating its belief that Appellant would be foolish not to allow the doctors to testify, *id.* at 913 & 918, Appellant continued to argue against the presentation of the psychiatrists' testimony, causing the court to refuse to allow it. *Id.* at 919.

In his first supplement to his PCRA petition, Appellant claimed that the trial court erred by allowing him to waive mitigation because the waiver was not knowing, voluntary, and intelligent and because the trial court and Commonwealth unnecessarily intervened in his penalty hearing. According to Appellant, when trial counsel announced that they would be calling the psychiatrists to testify during the penalty phase, the court "interrupted *sua sponte* to determine if [Appellant] might want to object to Dr. Blumberg taking the stand on the basis of a non-existent 'privilege.'" First Supplement to PCRA Petition, 2/16/2007, at ¶ 137.

Appellant averred that, "[b]y injecting itself into [Appellant's] presentation of mental health testimony, the [court] deprived [Appellant] of his right to counsel, and deprived the jury of hearing the most important piece of the mitigation case: [Appellant's] mental health disorders." *Id.* at ¶ 139. Appellant further contended that the trial court's actions deprived

him of his Eighth Amendment right for a jury to consider mitigating evidence and that counsel was ineffective for failing to object to the court's missteps.

The PCRA court rejected this claim. PCRA Court Opinion, 7/29/2019, at 10. According to the court, this Court previously concluded that it was Appellant who would not allow the presentation of mitigating evidence despite his counsel's desire to do so. The court observed that Appellant had the right to make that decision, rendering an ineffectiveness claim improper. The court asserted that the existence of a doctor-patient privilege "bears no influence on this right." *Id.* (citing *Commonwealth v. Puksar*, 951 A.2d 267 (Pa. 2008), for the proposition that "[c]ounsel was not ineffective in failing to investigate mitigating evidence, as defendant insisted on waiving mitigating evidence").

In his brief to this Court, Appellant insists that the trial court violated his Eighth Amendment right to present mitigating evidence when it erroneously concluded that Appellant had a doctor-patient privilege with Drs. Blumberg and Hostetter. Appellant's Brief at 126-27. In addition, Appellant baldly asserts that "there was no valid waiver of the presentation of this expert testimony," as Appellant's waiver of this right allegedly was not knowing, voluntary, or intelligent. *Id.* at 127-28. Appellant takes the position that trial counsel was ineffective for not objecting to this violation of his rights. In so doing, he argues that, had counsel objected, "there is a reasonable probability that the trial court would have permitted counsel to present testimony from Drs. Hostetter and Blumberg . . ., and there is a reasonable probability that at least one juror would have voted for life." *Id.* at 129.

Regarding the PCRA court's opinion, Appellant contests the court's conclusion that this Court previously ruled on his substantive claim, let alone the related claim of ineffective assistance of counsel. *Id.* at 131. To the extent that the PCRA court was relying on our opinion affirming Appellant's judgment of sentence, Appellant suggests

that, unlike the claim that he raised in his PCRA petition, the claim that he presented in his original appeal was that trial counsel was ineffective for presenting mitigating evidence, not failing to present mitigation evidence. *Id.*

Appellant also suggests that the PCRA court failed to appreciate that the trial court's erroneous statements regarding a doctor-patient privilege was only one factor that rendered his waiver unknowing and, thus, invalid. *Id.* at 132. According to Appellant, the court neglected to address the other factors that improperly influenced his decision to waive the presentation of mitigating evidence, such as the equivocal nature of the waiver. *Id.* Lastly, Appellant contends that the PCRA court improperly relied on *Puksar* to support its decision because, in his view, *Puksar* is factually distinguishable from the circumstances underlying his claim. *Id.* at 133.

In response, the Commonwealth maintains that the trial court had no obligation to override Appellant's instructions to his counsel not to present mitigation evidence. Commonwealth's Brief at 34-35. The Commonwealth further contends that the trial court did not violate Appellant's constitutional rights by inquiring into how Appellant wanted to proceed in the middle of his penalty hearing, given Appellant's "apparent unease at the testimony being presented." *Id.* at 35 (citing N.T., 10/12/1998, at 899-903). The Commonwealth points out that the trial court tried to convince Appellant that he should present the psychiatrists' testimony; yet, Appellant, against this advice and the advice of his counsel, nonetheless chose not to allow counsel to present mitigation evidence from the psychiatrists. *Id.*

As an initial matter, the record does not definitively support Appellant's claim that the trial court *sua sponte* injected itself into this matter by raising an issue as to Appellant's willingness to allow counsel to present the psychiatrists' testimony. As we detailed above, after the trial court refused to allow Attorney Trambley to testify, the court held an off-the-

record discussion with counsel. After that discussion, the court began conversing with Appellant and counsel regarding Appellant's willingness to allow counsel to present testimony from the psychiatrists. Because the sidebar discussion was not transcribed, the current state of the record does not reveal who initially raised an issue concerning Appellant's willingness to permit the presentation of the testimony.

Further, regardless of the nature of Appellant's current claim or the claim that he raised in his initial appeal, this Court determined in our previous opinion that Appellant affirmatively chose not to present mitigation evidence, including the testimony of Drs. Hostetter and Blumberg. *Reid*, 811 A.2d at 554 n. 42 (explaining that, "because Appellant notified the trial court that he did not want the psychiatrists to testify, the trial court precluded them from doing so[]" and that, at "that point in the hearing, Appellant informed trial counsel that he did not want him[, trial counsel,] to present any more evidence or argue during his closing argument that he suffered from a mental illness"). Additionally, regardless of whether the trial court erroneously believed that a doctor-patient privilege existed under these circumstances, the court ultimately discussed the presentation of these witnesses and allowed Appellant to decide whether he wanted counsel to pursue it, which is consistent with this Court's decision in *Sam*, 635 A.2d at 611-12 (holding that a "criminal defendant has the right to decide whether mitigating evidence will be presented on his behalf").

Lastly, and perhaps most importantly, given Appellant's conflicting claims regarding the presentation of mental health mitigation evidence, it seems that he is now arguing that, had he been provided with accurate information concerning this evidence, he would have permitted counsel to allow the psychiatrists to testify on his behalf. Appellant, however, fails to cite to any evidence of record to support this argument. For example, Appellant could have testified during the PCRA proceeding regarding his

current stance, and if the PCRA court would have credited that testimony, Appellant would have proven the substance of his claim as a matter of fact. Appellant fails to offer this testimony or any other evidence to support his claim, rendering his current argument meritless. Under these circumstances, we are unpersuaded that trial counsel were ineffective for not objecting to the manner in which the trial court handled Appellant's decision not to allow counsel to present the testimony of the psychiatrists.[22]

**9. "Were Appellant's constitutional and statutory rights violated by the admission of improper victim impact evidence; were prior counsel ineffective for failing to litigate this issue?"** Appellant's Brief at 4.

During the penalty phase of Appellant's trial, the Commonwealth presented several witnesses to provide victim impact testimony. Relevant to this appeal, the following witnesses testified in this capacity: Carrie Kuhn, Karen Wagaman, Nancy Stepler, and

---

[22] Justice Saylor would grant Appellant a new penalty phase hearing based on general concerns regarding Appellant's counsels' qualifications and the overall quality of their representation. *See*, *e.g.*, Concurring and Dissenting Opinion at 1-2 ("Appellant was represented by a public defender and an appointed counsel who had no experience whatsoever with death-penalty litigation.") (footnote omitted). We respectfully observe that Justice Saylor's concerns are substantially untethered to the specific claims raised by Appellant and dismiss the significant role that Appellant played throughout his trial in precluding counsel from presenting a more forceful defense during the penalty phase. *See*, *e.g.*, *Reid*, 811 A.2d at 553-54 (explaining that, prior to trial, Appellant refused to provide counsel with a litany of information relevant to the penalty phase despite stating that he understood the need for it).

Further, to the extent that the dissenting section of Justice Saylor's opinion addresses any of the particular claims raised by Appellant, it is unclear how he believes that those claims meet the exacting standards of the three-prong test for claims of ineffective assistance of counsel: (1) the underlying substantive claims have arguable merit; (2) counsel did not have a reasonable basis for his or her acts or omissions; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. *Cooper, supra*. Lastly, the dissent does not elucidate to what degree Appellant attempted to prove, let alone proved, each prong of those claims. *Id.* (explaining that a PCRA petitioner bears the burden of proving counsel's alleged ineffectiveness).

Tina Giles. Kuhn testified that: (1) Carla was her best friend, N.T., 10/12/1998, at 856; (2) Carla was a good mother, *id.* at 856-57; (3) Carla was a good friend, helping Kuhn take care of her newborn baby, *id.* at 858-59; and (4) Carla had good relationships with her children and had plans for their future, *id.* at 859-60. Wagaman testified that: (1) she was D.M.'s eighth grade English teacher, *id.* at 861; (2) D.M. was friendly and had a lot of friends in Wagaman's class, *id.* at 862-63; (3) D.M.'s death was hard on the student body, *id.* at 863-64; and (4) D.M. stated in a writing assignment that she was proud of her mother because she worked hard for the family, *id.* at 864.

Stepler testified that: (1) she was D.M.'s school counselor, *id.* at 865; (2) D.M. was liked by teachers and students, *id.* at 865-66; and (3) many students utilized school resources to help cope with D.M.'s death, *id.* at 866-67. Giles testified that: (1) she taught American Cultures to ninth grade students at D.M.'s school, but she knew D.M. through a tutoring program, *id.* at 868; (2) D.M. was kind and respectful, *id.*; (3) D.M. was well-liked in the school and was a beautiful person, *id.* at 868-69.

In his PCRA petition, Appellant complained that the "testimony of the teachers and impact on people other than the family members was impermissible under the victim impact statute in Pennsylvania."[23] PCRA Petition, 9/22/2004, at ¶ 389. Appellant further averred that the trial court failed to instruct the jury as to how to consider this evidence.

---

[23] The statute to which Appellant was referring provides as follows:

> The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

42 Pa.C.S. § 9711(c)(2).

*Id.* at ¶ 390. Appellant claimed that trial counsel were ineffective for failing to object to the testimony of these witnesses and to the trial court's failure to instruct the jury properly. *Id.* at ¶ 392.

The PCRA court rejected this claim, although its specific basis for doing so was somewhat unclear. PCRA Court Opinion, 7/29/2019, at 7-9. Stated succinctly, the court seems to have concluded that the Commonwealth had the statutory right to present this victim impact testimony in this case and that, in any event, Appellant failed to establish the prejudice prong of the ineffective-assistance-of-counsel standard.

In his brief to this Court, Appellant argues that the PCRA court's conclusions constitute "legal error." Appellant's Brief at 138. Appellant asserts that the complained-of testimony "did not relate to the impact on the family of the victim, was inappropriate, and should have been accompanied by an instruction as to its use." *Id.* In terms of the prejudice prong of his claim of ineffective assistance of counsel, Appellant merely offers the following bald assertions:

> Given inappropriate victim impact testimony and no guidance from the trial court on how to consider it, Appellant's penalty phase jury was primed to ignore the mitigation, weigh the victim impact improperly, or consider the improper testimony regarding the characteristics of the decedents or impact on the community when rendering its verdict. Had counsel been effective, there is a reasonable probability that at least one juror would have voted for life. Had [appellate counsel] raised the issue on direct appeal, . . . , there is a reasonable probability that this Court would have granted a new penalty phase.

*Id.* at 137-38.

In response, the Commonwealth contends that it was entitled to present the victim impact testimony at the penalty phase of Appellant's trial. Commonwealth's Brief at 36-37. The Commonwealth posits that the victim impact testimony it elicited from the above-mentioned witnesses was an individualized and subjective commentary on the consequences of the murders on the persons closest to the victims. *Id.* at 37. The

Commonwealth concedes that the trial court failed to instruct the jury concerning how it should consider the victim impact testimony, but it insists that the instruction would not have benefitted Appellant. *Id.* at 38. In this regard, the Commonwealth maintains that "either the jury considered the victim impact evidence (as they would have been instructed to do) or they ignored the victim impact evidence (which helped Appellant)." *Id.* at 38.

"The Pennsylvania Sentencing Code permits the introduction of two types of victim impact evidence during the penalty phase of a capital trial: (1) evidence about the victim; and (2) evidence regarding the impact that the death of the victim has had on the victim's family." *Commonwealth v. Frein*, 206 A.3d 1049, 1072 (Pa. 2019) (citing, *inter alia*, 42 Pa.C.S. § 9711(c)(2)). The admission of this evidence is within the sound discretion of the trial court, "which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury." *Id.* (internal quotation marks and citation omitted). In addition, if a trial court permits the introduction of victim impact testimony, the Sentencing Code requires the court to "instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family." 42 Pa.C.S. 9711(c)(2).

Here, the vast majority of the victim impact testimony offered by the Commonwealth related to the victims, Carla and D.M., and their families, constituting admissible evidence for purposes of the penalty phase of Appellant's trial. However, we recognize that some of the evidence arguably falls outside of permissible victim impact testimony. For example, as Appellant contends, Wagaman and Stepler briefly testified about the impact that D.M.'s death had on her fellow students. We further observe that the trial court indisputably did not instruct the jury as required by the Sentencing Code.

Yet, despite the potential arguable merit of Appellant's claim that trial counsel should have objected to these alleged oversights, Appellant nonetheless has failed to persuade us that the PCRA court erred by finding that his claim fails to meet the prejudice prong of the ineffective-assistance-of-counsel standard.

More specifically, the weight of the three aggravating circumstances proved by the Commonwealth as to both victims was undeniably heavy, and the parties stipulated that the jury must consider the mitigating factor that Appellant did not have a significant history of prior criminal convictions. Given these circumstances, we are unconvinced that, had counsel successfully objected to the potentially impermissible victim impact testimony and the lack of an instruction regarding such testimony, there is a reasonable probability that the outcome of the penalty hearing would have been different. Indeed, Appellant's claim that, but for counsels' omission, there is a reasonable probability that at least one juror would have voted for life, amounts to speculation and conjecture, which is insufficient to establish prejudice. *Commonwealth v. Pursell*, 724 A.2d 293, 311 (Pa. 1999) ("Claims of ineffective assistance of counsel that are based on speculation and conjecture do not adequately establish the degree of prejudice necessary; namely, that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different.").

**10. "Is Appellant entitled to relief from his conviction and sentence because of the cumulative effect of the constitutional violations errors [(*sic*)] in his case?"**
Appellant's Brief at 4.

Under his last issue, Appellant posits that he should be granted relief based upon the cumulative, prejudicial effect of trial counsels' allegedly deficient representation of Appellant. Appellant's Brief at 138-39. The Commonwealth obviously disagrees with Appellant's position. Commonwealth's Brief at 38.

As we explained *supra*, no number of claims which fail on their merits may collectively warrant relief; however, "[w]hen the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Spotz*, 18 A.3d at 320-21. While we acknowledge that the PCRA court still must author a supplemental opinion addressing its reasons for denying relief on the specific claims detailed *supra*, we have concluded that the remainder of his claims warrant no relief. In reaching this conclusion, we rejected Appellant's contentions in numerous ways. "To the extent that we reject some of Appellant's issues based upon a prejudice analysis, we also find that collective prejudice is lacking and, thus, deny relief on this issue." *Wholaver*, 177 A.3d at 180.

### V. Conclusion

For the reasons set forth above, we affirm, in part, the order dismissing Appellant's PCRA petition. In addition, we remand the matter to the PCRA court solely to allow that court to provide a supplemental opinion addressing why it denied relief on the following issue: "Was the defendant incompetent to proceed to trial and represent himself; were prior counsel ineffective for failing to investigate and effectively litigate this issue before trial and failing to raise it on appeal?" Appellant's Brief at 3. The PCRA court shall have 90 days from the date of this Opinion to file its supplemental opinion.

Order affirmed in part. Case remanded with instructions. Jurisdiction retained.

Justices Todd, Dougherty, Wecht and Mundy join the opinion.

Justice Saylor files a concurring and dissenting opinion in which Justice Donohue joins.